IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CHRISTOPHER THOMAS WOOLVERTON in his Individual Capacity and as Personal Representative of the Estate OF CHRISTOPHER DOUGLAS WOOLVERTON | § § § § § § | |
| Plaintiff, | § § | 2:15-CV-314 |
| v. | § § | |
| BRAD LIVINGSTON, *et al.*, | § § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
TO GRANT IN PART AND DENY IN PART,
DEFENDANTS GRUVER, GRATZ AND SEYMOUR'S JOINT MOTION FOR
SUMMARY JUDGMENT ON THE DEFENSE OF QUALIFIED IMMUNITY**

Before the Court is Defendants GRUVER, GRATZ, and SEYMOUR's Joint Motion for

Summary Judgment on the Defense of Qualified Immunity ("Joint Motion"), with a

supplemental brief in support and appendix of evidence. [ECF 227, 228, 229, respectively].

Plaintiff CHRISTOPHER THOMAS WOOLVERTON (proceeding on his own behalf and on

behalf of his father's estate) filed a Response to the Joint Motion, along with a Brief in

Opposition to the Joint Motion and an appendix of evidence. [ECF 238, 239, 240, respectively].

Defendants filed a Reply to the plaintiff's Response with an attached appendix. [ECF 248][1].

---

[1] The defendants also filed a Motion to Strike Evidence [ECF 248] as part of their reply to plaintiff's Response to the joint motion, and plaintiff filed a response to the Motion to Strike. [ECF 252]. The District Court entered an Order Granting in Part and Denying in Part the defendants' Motion to Strike Evidence [ECF 258]. The Court has taken into account the Order in considering the inmate witness statements in issuing these Findings, Conclusions and Recommendation. To the extent that these witness statements contain evidence the District Court deemed inadmissible, this Court will not consider those statements in making a determination on qualified immunity. To the extent the witness statements are probative to the issue of qualified immunity and based on personal knowledge of the declarant, this Court has considered those statements, even if not directly mentioned in these Findings, Conclusions and Recommendation.

Plaintiff filed a Sur-Reply to the defendants' Reply. [ECF 253]. This Court has reviewed all of the summary judgment evidence identified in this paragraph and all the arguments of the parties set forth in these documents.[2]

This case arises out of plaintiff's claims under 42 U.S.C. § 1983. Plaintiff makes claims of excessive force and deliberate indifference to serious medical needs in violation of the Eighth Amendment. These claims arise from the treatment of his deceased father, Texas Department of Criminal Justice ("TDCJ") inmate CHRISTOPHER DOUGLAS WOOLVERTON ("Woolverton") by the defendants, GRUVER, GRATZ, and SEYMOUR, all of whom were prison guards at the TDCJ Clements Unit where Woolverton was housed during the relevant time prior to his death.

I.
THE FACTUAL EVIDENCE BEFORE THE COURT

A.  FACTUAL OVERVIEW

Woolverton was a TDCJ inmate housed at the Clements Unit beginning prior to 2013 and continuing through his death while incarcerated on October 23, 2013. He was serving a sixty-to-life sentence and was classified as a Level 3 offender (regularly non-compliant with orders, highest risk of danger or self-harm) by prison staff. TDCJ housed Woolverton in the E-pod of the Administrative Segregation section of the Clements Unit during 2013. During the relevant time of the allegations contained in plaintiff's complaint, defendant Andrew GRATZ ("GRATZ") was a Sergeant and defendant Matthew SEYMOUR ("SEYMOUR") was a Lieutenant. Both defendants were assigned to oversee the inmates on the E-pod wing of the Administrative

---

[2] The Court notes that additional remaining defendants BITTLE, KILLIAN, and SHOOK have filed an independent Motion for Summary Judgment. [ECF 219]. Additionally, remaining defendant DAVID has filed a Motion for Summary Judgment on Qualified Immunity grounds. [ECF 230]. The Court has *not* considered either the evidence or arguments attached to these independent motions in issuing these Findings, Conclusions and Recommendation with regard to GRUVER, GRATZ, and SEYMOUR's Joint Motion.

Segregation section of the Clements Unit while Woolverton was housed there. Defendant Michael GRUVER ("GRUVER") was a Major and a supervisor to GRATZ and SEYMOUR.

Woolverton was transferred to the Clements Unit after serving some of his state-mandated sentence in a mental health unit. Prior to his transfer to Clements, Woolverton was diagnosed with stage IV or higher chronic kidney disease, asthma, and mental health disorders. He used a foley catheter due to benign prostatic hyperplasia and suffered from frequent urinary tract infections.

These conditions are documented by the medical records. It also appears from the medical records that not only did Woolverton's kidney ailment constitute a progressive and degenerative disorder, but also that his condition was worsening over time. As part of his prescribed treatment for kidney disease, Woolverton had to use a catheter to void his bladder on most occasions.

Debra Killian ("Killian") (also a defendant in this case, but not a party to this Joint Motion), was a Licensed Vocational Nurse assigned to care for inmates at the Clements Unit, including Woolverton. On October 22, 2013, Killian notified GRATZ that Woolverton needed to be taken to "row 2," the medical department at the Clements Unit.[3] Woolverton did not come to the door of his cell on his own when given verbal commands to do so in order to go to the medical department. GRATZ sought approval from GRUVER to use a five-man extraction team and oleoresin capsicum ("OC") spray if necessary to transport Woolverton to his medical appointment. GRUVER gave approval to use an extraction team and to use force as necessary,

---

[3] Prior to the incident on October 22, 2013, Woolverton was diagnosed with several documented medical conditions. However, with regard to this Joint Motion, the Court will only consider Woolverton's medical conditions as they relate to the knowledge *these three defendants* had of any those conditions prior to and during the events of October 22, 2013. Specifically, plaintiff alleges in his Amended Complaint GRUVER, GRATZ, and SEYMOUR had knowledge of Woolverton's asthma problems and his designation as "do not gas" prior to the use of force involving OC spray in extracting Woolverton from his cell.

including the use of OC spray. Killian was present during the use of force, as was SEYMOUR.

During the extraction from his cell, Woolverton was sprayed twice with OC spray, physically carried out of his cell, and handcuffed to a gurney. He was examined by a TDCJ medical doctor, Charles Bittle, Jr. (also a defendant, but not a party to this Joint Motion). During the examination, defendant GRATZ placed a mask over Woolverton's nose and mouth. Woolverton was not catheterized to release urine during the medical examination and was not given any medications at that time. No fluids were given to Woolverton during the examination. Woolverton was not decontaminated of the OC spray during his time at the medical department. After the examination, defendants transported Woolverton back to the E-pod, albeit to a different cell, and defendants left Woolverton, still covered in OC spray, there on the floor of the new cell.

At some point later, inmate witnesses indicate "the major," whom the Court will presume to be GRUVER in interpreting the evidence in the light most favorable to plaintiff, along with "the warden," whom the Court will presume to be David, and other individuals in "street clothes," returned to the cell and witnessed plaintiff lying naked on the floor of his new, empty cell. Witnesses indicate these individuals made derogatory comments to Woolverton and did nothing further to assist him. These witnesses had previously identified actions taken by GRATZ and SEYMOUR before the extraction process, so the failure of these witnesses to indicate that GRATZ and SEYMOUR returned to the new cell with "the major" and "the warden" indicate to the Court that the individuals in "street clothes" were other officers not parties to his lawsuit.

Early in the morning hours of October 23, 2013, Woolverton was found unresponsive in his cell. CPR and other revival efforts were performed, but an EMT pronounced Woolverton dead shortly before 2:00 a.m.

B. CHRONOLOGY OF EVENTS RELEVANT TO GRUVER, GRATZ, AND SEYMOUR

ON OCTOBER 22 AND 23, 2013[4]

1. *Medical staff determined Woolverton needed to be taken to "row 2" for medical treatment.*

Killian called GRATZ and SEYMOUR to Woolverton's cell around lunchtime on October 22, 2013. Killian told GRATZ and SEYMOUR that Woolverton had to be removed from his cell to go to medical, by doctor's orders. [ECF 229 at 13]. Killian told GRATZ and SEYMOUR that Woolverton refused a strip search and refused to comply with restraint procedures in order to go to medical. [ECF 229 at 71].

Inmate witnesses heard GRATZ respond with comments like "f--- him," and "I'm not doing s--- for him, he can die all I care [sic]," when Killian told GRATZ of Woolverton's need for medical transport. [Rashid Grievance, Palomo Statement, Currenton Statement, ECF 240 at 73, 86, 97]. Another witness also reported seeing GRATZ attempt to ignore Killian when Killian first demanded to have Woolverton transported to medical. [Ventura Statement, ECF 240 at 94]. Inmate witnesses reported seeing GRATZ approach Woolverton's cell and bang on it, demanding he rise and present himself to be handcuffed for transport to medical, and then threaten to gas Woolverton if he did not comply. [Ventura Statement, Currenton Statement, ECF 240, at 94, 97]. Killian insisted that Woolverton had to go to the medical department even if he refused to go; Killian testified "she didn't care how [Woolverton] got there," but he had to go to medical on that day. [ECF 237 at 188]. Woolverton was referred to the medical department by the mental health department after a mental health worker observed him in his cell that morning. [ECF 237 at 185].

---

[4] Plaintiff alleges claims under the Eighth Amendment for deliberate indifference by these defendants ranging from August of 2103 through October 23, 2013. However, plaintiff did not file his initial complaint until October 20, 2015. [ECF 1]. Defendants have objected to the timeliness of claims from any events prior to October 20, 2013, including any use of force against Woolverton on October 7, 2013, and any indifference to medical needs before that date as well. The Court will not consider claims before that date, as these claims are outside the statute of limitations.

2.  *GRUVER[5] approved the use force to extract Woolverton from his cell if he did not comply with verbal orders to be handcuffed and searched.*

GRATZ spoke to Killian first and then left SEYMOUR to speak with Killian while he went to discuss the situation with GRUVER. [ECF 229 at 13]. GRUVER returned to the cell with GRATZ to observe the situation. [ECF 229 at 41, 43-44]. GRUVER looked into the cell (for approximately 30 seconds) and saw Woolverton's legs moving back and forth, as he lay on the ground. *Id*. GRATZ brought GRUVER to the cell in order to obtain authorization to use a five-man extraction team to take Woolverton to his medical appointment. [ECF 229 at 71]. GRUVER gave approval for both an extraction team and OC spray. [ECF 229 at 16]. GRUVER claimed he gave GRATZ approval to remove Woolverton from his cell because Killian told the officers (himself included) that Dr. Bittle had ordered a medical appointment for Woolverton that had to be kept. [ECF 229 at 39-40].

GRUVER stated he knew Woolverton to be "one of the most aggressive inmates," "a discipline problem," and to "have violent outbursts" based on past interactions with Woolverton and also on Woolverton's housing assignment; this knowledge influenced GRUVER'S decision regarding the use of force. [ECF 229 at 46, 48]. GRUVER had just reviewed a use of force report on Woolverton from October 7, 2013 when he gave the October 22, 2103 approval to use the extraction team and OC spray if necessary because they had previously had to use OC spray to gain Woolverton's compliance on that earlier occasion. [ECF 229 at 46-48]. GRUVER stated he saw the video of the extraction from October 7, 2013. *Id*.

---

[5] In plaintiff's Amended Complaint, plaintiff acknowledges that GRUVER is the security supervisor who approved the use of chemical agents on Woolverton. [ECF 77 at 10]. The Court is aware that plaintiff has made allegations in a separate pleading that Assistant Warden David may have had a role in the authorization for use of force and use of chemical agents. However, the Court does not address any claims involving David in this recommendation. Instead, the Court takes as true GRUVER's admission that he authorized use of chemical agents, and the plaintiff's acknowledgement in the Amended Complaint of such admission, for purposes of *this* Joint Motion and the Court's analysis herein.

The October 7, 2013, video [ECF 229, second attached video ("video2")] showed Woolverton complaining of his lungs burning after the application of chemical spray. [video2 at 4:30-5:45]. Inmate witness statements, as well as Killian's deposition testimony, confirm that Killian attempted to convince Woolverton to comply with verbal orders to be handcuffed for transportation; although her specific comments are not known, witness statements indicate she mentioned Woolverton "couldn't breathe" from the last use of OC spray. [Rashid Statement, ECF 240 at 89-90]. GRATZ was present cell side when Killian spoke to Woolverton to convince him to comply; at times, SEYMOUR was also present. [Rashid Statement, ECF 240 at 89-90, ECF 229 at 96]. GRATZ stated he had no knowledge of Woolverton's medical conditions at any time during or before the extraction took place and did not ask anyone about his medical condition prior to extraction. [ECF 229 at 22, 23]. Killian stated she never told GRATZ, GRUVER or SEYMOUR that Woolverton was on the "do not gas" list and never discussed his medical history with them. [ECF 240 at 122]. In response to questioning about the guards who were part of the extraction team, including GRATZ and SEYMOUR, Killian testified she believed the guards knew Woolverton was on a "do not gas" list; however, she also testified she knew he would be gassed if he did not comply with orders. *Id*. Killian had this knowledge because she was part of the 24-hour medical team that allowed TDCJ guards at Clements to gas inmates, even if they had medical conditions making use of OC spray contraindicated by medical standards. [ECF 240 at 122-123].

The TDCJ Use of Force Plan (the "Plan") sets out policies and procedures for TDCJ guards to follow when using force on an inmate. The Plan in effect at the time of this incident was drafted in February of 2012. The Plan allows restraint to be used to accomplish medical treatment "if an offender refuses medical treatment that licensed medical staff believes is

necessary for the safety of the offender." [ECF 240 at 193]. The Plan authorizes the use of

chemical agents "if lesser means have proven ineffective" on an inmate "who refuses to obey a

lawful order." [ECF 240 at 193]. The Plan requires authorization to proceed with a use of force

in using chemical agents. [ECF 229 at 83-84]. Specifically, the security staff member on duty

"shall attempt to handle the situation without force." *Id*. at 83. If that fails, the security supervisor

"shall notify the highest-ranking shift supervisor on duty" and "the highest-ranking shift

supervisor on duty shall decide if a chemical agent shall be used to gain compliance." *Id*. at 83.

The Plan specifically addresses contacting medical and mental health staff prior to a use

of force and states "prior to the use of chemical agents, where circumstances permit, medical *and*

mental health staff shall be consulted, *and* medical records reviewed to determine if the use of

chemical agents would be detrimental to the mental or physical health of the offender." [ECF

229 at 84 (emphasis added)]. The Plan states:

> *when licensed medical staff is not on-site*, the highest-ranking shift supervisor on duty shall
> refer to the Use of Force Contraindications List and contact the on-call licensed medical
> staff in an effort to obtain prior medical clearance for use of chemical agents unless an
> emergency exists and use is necessary to prevent loss of life, significant property damage,
> or imminent bodily injury to persons.

*Id*. (emphasis added). Additionally, the Plan *forbids* the use of chemical agents on "offenders

who are incapable of responding to commands and orders being given to them by staff, such as

during epileptic seizures or other similar situations." [ECF 240 at 193].

The Plan addresses notification of medical staff during a use of force. "The security

supervisor in charge shall notify licensed medical staff of the impending use of force and request

they be present, if possible. *Licensed medical staff shall advise of any existing medical problems*

*that preclude the use of force*." [ECF 240 at 201 (emphasis added)]. Only when "licensed

medical staff is not on-site" does the highest-ranking shift supervisor have to "refer to the Use of

Force Contraindications List" and "contact on-call licensed medical staff to obtain prior medical clearance." *Id*. GRUVER testified that the guards had "constant" consultation with medical during this entire use of force process. [ECF 240 at 206]. GRUVER also testified he did not order GRATZ or SEYMOUR to ask medical about Woolverton's conditions, nor did he himself ask Killian about contraindications, but he did speak with Killian prior to authorizing force. [ECF 240 at 207].

However, GRATZ and SEYMOUR stated that they had no knowledge of any of Woolverton's medical conditions during or prior to using force on him to extract him from his cell and that they had no reason to contact medical to determine any contraindications for use of force because Killian was present to tell them any issues they needed to know. [ECF 240 at 18, 59, 158-159, 184]. Killian stated she did not tell GRATZ, GRUVER, or SEYMOUR about Woolverton's medical conditions. [ECF 240 at 122-123]. GRUVER indicated that Killian expressed to him that Woolverton needed to be seen by medical, and GRUVER felt he had no choice but to extract Woolverton from his cell. [ECF 229 at 40]. Killian also agreed she "didn't care how he got there [to the doctor]" because Woolverton's need to see a doctor was so urgent. [ECF 240 at 114].

> 3. *Lesser Use of Force Attempts: SEYMOUR and GRATZ, along with Killian, attempted to get Woolverton to rise and be handcuffed multiple times before he was first sprayed with OC spray; witness statements indicate Woolverton was abnormally quiet and unresponsive.*

Prior to using force, the Plan requires:

all reasonable action shall be taken to stabilize the situation. Reasonable actions should include the following whenever possible: a. listening; b. attempting to calm or reason with the offender; c. explaining the consequence of the offender's behavior; d. notifying the security supervisor; e. requesting video camera and operator; f. securing the area where the offender is located; g. requesting additional security staff; h. making a visible show of force with staff presence; and i. implementing the Incident Command System

(ICS).

[ECF 240 at 195]. The October 22, 2013, video [ECF 229 at first attached video "video1"] showed SEYMOUR, GRATZ, and Killian ordered and tried to persuade Woolverton to stand up and come to the cell door, and then warned Woolverton they would use force if necessary. GRATZ stated Woolverton responded by saying he "would comply," but Woolverton did not ever attempt to stand up. [ECF 229 at 14]. On one occasion Woolverton sat up [ECF 229 at 17], but failed to try to stand. A visible show of force was used and additional security staff was requested by bringing a five-man extraction team to the cell. [video1 at 0:01]. Clearly, a video camera and operator were secured, and the security supervisor's consent to use force was obtained. [video1 (entire), ECF 229 at 15-16].

An expert opinion indicates that, due to his medical condition, Woolverton might have had an altered mental state, rendering him unable to comply with these orders. [ECF 240 at 264-272]. No summary judgment evidence shows GRUVER, GRATZ or SEYMOUR knew about Woolverton's possibly altered mental state from his medical condition.

Inmate witnesses state they observed markedly unusual behavior by Woolverton in the two days prior to October 22, 2013. [ECF 240 at 76-102]. One witness described Woolverton as a "cell warrior," always very vocal, loud and aggressive. [Palomo Statement, ECF 240 at 86]. However, that same witness indicated that for two days prior to the incident, Woolverton was quiet and unresponsive and had not eaten anything. [Palomo Statement, ECF 240 at 86-87]. Another inmate witness describes Woolverton as "unresponsive" when medical personnel and officers attempted to interact with him on October 22, 2013. [Miller Statement, ECF 240 at 101].

### 4. Officers used a first application of OC spray.[6]

In using chemical agents, the Plan states, "chemical agents used shall be the minimum amount necessary to gain compliance." [ECF 229 at 84]. The Plan also states that "OC spray is dispersed first; however, if it is ineffective in gaining the offender's compliance, security staff may subsequently disperse CS [orthochlorbenzalmalononitrile] spray." [ECF 240 at 198]. The Plan further allows for an OC/SC blend to be used. *Id*. From a more complete reading of the Plan as to use of force, it appears OC spray is a first line (minimum) use of force beyond verbal intervention. *Id*. The Plan, as presented in evidence by the parties, does not have specific instructions regarding any force to be used at a level in between verbal intervention and OC spray.

The Plan discusses the expected effects of OC spray as follows: "may cause acute burning and closing of the eyes, along with inflammation of mucous membranes and upper respiratory system" and these effects are "instantaneous." *Id.* According to witness accounts, Woolverton covered his face and upper body with his hooded jacket during the first application of OC spray. [ECF 229 at 18]. Woolverton was sitting up at the time the spray was deployed, and laid back down after it was over. *Id*.

As seen in the October 22, 2013, video, GRATZ and SEYMOUR attempted to use verbal intervention to get Woolverton to comply with a strip search and to approach the door to be handcuffed. [video1 at 1:42-2:00, 2:50-2:55 (GRATZ), 2:22-2:40, 3:11-3:24 (SEYMOUR)]. The video shows that SEYMOUR and GRATZ attempted verbal intervention four times before the

---

[6] There are many witness statements regarding the events that took place during the application of the OC spray and the removal of Woolverton from his cell. These statements are made by the defendants, TDCJ staff and inmate witnesses. The Court has reviewed all of this evidence, and finds that the video depicts the most accurate evidence of the timing of the events, the specific actors and their respective behaviors. To the extent that statements contradict the video, the Court relied on the video evidence.

first application of OC spray was deployed. *Id.* SEYMOUR stated he and GRATZ asked Woolverton to comply approximately six times before OC spray was deployed, some prior to the video starting. [ECF 229 at 62]. SEYMOUR also stated Killian attempted to get Woolverton to comply before the recording process started. *Id*. Killian also stated she tried to get him to comply. [ECF 229 at 96]. When these attempts failed to gain Woolverton's compliance, SEYMOUR warned Woolverton that OC spray would be deployed if he did not comply. [video1 at 3:15-3:24]. According to GRATZ and SEYMOUR, who were seen pressing their ears to the cell door and looking inside of it, Woolverton rocked back and forth on the cell floor and verbally responded that he would comply, but did not stand up. [*Id*., ECF 229 at 17].

Woolverton never arose nor approached the cell door prior to the initial application of OC spray. [video1 at 0:00-3:50]. As seen in the video, GRATZ authorized a member of the five-man extraction team to use OC spray on Woolverton. [video1 at 3:50]. That officer deployed an approximately 3-4 second burst of OC spray through the food slot into Woolverton's cell. [video1 at 3:56-4:00].

After the spray was deployed, GRATZ observed Woolverton go from a sitting position, back to a prone position on the ground of his cell. [ECF 229 at 17-18]. Woolverton did not approach the cell door after the application of the spray. [video1 at 4:00-7:30]. The other inmates located in the E-pod unit yelled at officers and at Woolverton, which made any statements by Woolverton from inside the cell decidedly difficult to distinguish and confirm with any certainty. [video1 at 0:30-7:30]. However, the officers performing the extraction were seen pressing their ears to the cell door and speaking to Woolverton in a way that appeared to confirm Woolverton made some sort of conversation with or statements to the officers during the attempted extraction. [video1 at 2:50-2:55, 3:11, 7:15].

*5. Officers used a second application of OC spray.*

After the first application of OC spray, GRATZ and SEYMOUR once again spoke to Woolverton for approximately 3 ½ minutes and attempted to get him to comply with orders. [video1 at 4:00-7:25]. Woolverton did not approach the cell door at any time. [video, *Id.*]. GRATZ once again authorized a member of the five-man extraction team to use a second application of OC spray on Woolverton. [video1 at 7:28]. A second approximately 3-4 second burst of OC spray was deployed through the food slot into Woolverton's cell. [video1 at 7:30-7:34]. Woolverton still did not approach the cell door. [video1 at 7:34-8:30]. GRATZ stated that a second application of OC spray is standard procedure when an inmate is responding but failing to comply with orders prior to entering a cell to perform an extraction where physical force could be used. [ECF 240 at 26].

Plaintiff presented an expert report on the use of force in TDCJ situations that states an evaluation of the inmate's ability to comply with orders is necessary between the first application of OC spray and any subsequent application. [ECF 240 at 237-238]. Based on a review of the video, the plaintiff's expert believes the second application of OC spray was clearly excessive "because it was even more apparent that Woolverton was *unable* to comply." [ECF 240 at 256]. The purpose in using OC spray is because the typical effects render an inmate more, not less, compliant, and OC spray does not affect an individual's motor function. [ECF 240 at 229].

*6. Officers physically removed Woolverton from his cell to the gurney.*

Following the second application of OC spray, GRATZ and SEYMOUR once again attempted to use verbal intervention to get Woolverton to approach the cell door. [video1 at 9:00-10:15]. When Woolverton once again did not approach the cell door, GRATZ told the five-man extraction team to enter the cell to extract Woolverton. *Id.* On the video, the audio reveals both

SEYMOUR and GRATZ instructed the five-man extraction team to "use the minimum amount of force necessary" to gain compliance, and they stressed the words "minimum amount." [video1 at 10:15]. Once the five-man team entered the cell, the video showed Woolverton on the ground of the cell. *Id*. The five-man team members did not jump on Woolverton, did not place him in any hold positions or hit him in any way; the members handcuffed his arms behind his back and shackled his legs. [video1 at 10:30-11:00]. GRATZ then ordered Woolverton to rise to his feet. [video1 at 11:35-12:30]. Woolverton made it to his knees the first time, but did not get to his feet. *Id*. The second time, it appeared the members of the extraction team helped Woolverton get to his feet, and he took a few shuffling, small steps, but did not appear to be able to walk to the gurney. *Id*. GRATZ then ordered the five-member team to carry Woolverton to the gurney. [video1 at 13:00-13:40].

   7.   *Killian performed a post use of force physical examination on the way to the medical department.*

After Woolverton was handcuffed to the gurney, he was transferred to "row 2" of the medical department. [video1 at 14:00-20:00]. Nurse Killian, who was present during the transport, questioned Woolverton upon arrival at the medical unit regarding any injuries he suffered during the use of force. [video1 at 20:15-22:00]. Woolverton was seen and heard moaning and stating his face was hurting badly. [ECF 240 at 177, video1 at 20:15-20:45]. Woolverton did not state he was injured during the use of force, but also did not appear to directly answer any of Killian's questions. [video1 at 20:15-24:35, part 2 0:00-1:22].

   8.   *Dr. Bittle performed a medical examination.*

Dr. Bittle did a perfunctory physical examination of Woolverton and asked him several questions concerning his kidney issues. [video1 at 20:15-24:54, part 2 0:00-1:22]. Woolverton

continued to moan and complain about pain from the OC spray, but did not directly answer Dr. Bittle's questions. *Id*. Killian attempted to persuade Woolverton to answer the doctor's questions and to seek treatment for his kidney pain and catheter problems, rather than focusing on the pain from the use of OC spray. *Id*.

At no time during the medical exam did Killian or Bittle decontaminate or help remove OC spray residue from Woolverton. *Id*. Killian later testified "we [medical] don't assist anybody with pepper spray on their face … it's just corrections. We don't assist people." [ECF 240 at 120]. However, plaintiff's expert concluded, "[when] OC spray is applied to an inmate prior to a medical appointment, the inmate is typically given some opportunity or assistance in at least a perfunctory decontamination *before* the medical appointment." [ECF 240 at 230].

Dr. Bittle ordered testing done on the clothing containing feces found in Woolverton's cell, but released Woolverton from the medical department without providing any fluids, medications, catheterization assistance, or other medical care to Woolverton. [video1 at part 2, 0:30, ECF 240 at 118-119].

*9. GRATZ placed a mask over Woolverton's mouth during the medical examination.*

On the video, Woolverton made throat clearing noises and appeared to raise his chin, but it is unclear if he was trying to spit. [video1 at 23:40]. GRATZ and GRUVER both stated they were familiar with Woolverton's history of spitting on officers and spitting toward the cell door in an attempt to transmit diseases to the officers. [ECF 229 at 21, 46-47]. GRATZ placed a mask over Woolverton's face during the medical examination. [video1 at 24:25]. GRATZ testified he placed the mask over Woolverton's face in a preemptive move to protect his officers and medical staff from being spit upon, but GRATZ agreed in his deposition he could not clearly see if Woolverton was actually trying to spit on anyone. [ECF 229 at 21]. Plaintiff's medical expert

stated that mucus build-up is an after effect of OC spray and Woolverton should not have had a masked placed over his mouth as an asthmatic. [ECF 240 at 272]. The video indicated that all TDCJ medical staff and officers were wearing protective masks and gloves when the mask was placed on Woolverton. [video1 at 24:25].

　　*10. Woolverton was taken back to E-pod and placed in a new cell.*

　　After Killian and Bittle medically cleared Woolverton, he was ordered returned to the E-pod by GRATZ. [video1 at part 2, 1:00]. However, Woolverton's original cell had to be decontaminated, so Woolverton was taken to a temporary cell. [video1 at part 2, 2:50]. GRATZ and the five-man extraction team, along with Killian, transported Woolverton to this new cell. [video1 at part 2, 1:22-2:50]. Once at the cell, Woolverton had to be carried into the new cell because he could not walk; although he could sit up on his own, he also appeared to be in distress. [video1 at part 2, 2:55-4:25]. Killian was present and again briefly questioned and observed Woolverton to catalog any injuries sustained from the application of the use of force, at the request of GRATZ. [video1 at part 2, 4:14-4:25]. Woolverton continued to complain of pain from the use of OC spray and stated he cannot breathe; it appeared he was able to breathe enough to speak in the video and he did not appear to be gasping or wheezing but he had a mask over his face, making him more difficult to understand. [video1 at part 2, 4:25]. GRATZ asked Woolverton if he was injured and Woolverton complained that his [groin] hurt. [video1 at part 2, 4:35]. The handcuffs and leg shackles were removed prior to the officers exiting the cell. [video1 at part 2, 4:45-5:30]. GRATZ was seen on the video placing a piece of paper in the cell door for Woolverton that allowed him to make a statement about the use of force. [video1 at part 2, 5:40]. GRATZ explained the OC spray affects would subside within 30 minutes and explained the decontamination procedures through the cell door. [video1 at part 2, 5:40-6:00].

11. *The Plan addresses decontamination procedures and Killian asked additional questions.*

The Plan lists the decontamination procedures that must be employed after officers use OC or CS spray on an inmate. Specifically, "after chemical agents have been used and the situation has been brought under control, individuals and the area affected by chemical agents shall be decontaminated as soon as possible." [ECF 240 at 199]. Moreover, "all affected individuals shall be examined *by licensed medical staff*, properly decontaminated *or* advised as to proper decontamination procedures, and offered a change of clothing." *Id.* (emphasis added). "*Force shall not be used to decontaminate an offender*." *Id.* (emphasis added).

In order to decontaminate an individual sprayed with OC spray, the Plan indicates "mov[ing] the affected individual to uncontaminated air," "remov[ing] contaminated clothing," and "if the contaminated portion of the body is primarily limited to the facial area and there is no ongoing exposure in the cell from residual agent, *the offender* may flush in-cell by cupping water and splashing it on the face. Otherwise, or if symptoms persist after facial flushing, the offender may be offered a shower or allowed to shower in-cell if possible." [ECF 240 at 199 (emphasis added)]. The Plan does not clearly state if the responsibility to decontaminate falls on the offender or on the TDCJ staff.

GRATZ and Killian remained in the new cell after Woolverton was deposited there. While in the cell, GRATZ explained the decontamination procedures to Woolverton and indicated the cell had a shower and sink to allow Woolverton to decontaminate himself. [video1 at part 2, 5:40-6:00]. At no time did either Killian or GRATZ attempt to decontaminate Woolverton, nor can they be heard asking Woolverton if he would be capable of decontaminating himself. *Id*. The video seemed to indicate that Woolverton was too weak to

walk on his own and was too far away from the sink or shower to reach the faucets without walking. [video1 at part 2, 1:22-6:00].

Killian asked Woolverton questions about the use of force after he was returned to the E-pod. *Id.* Woolverton complained about continued burning from the OC spray and about his breathing. *Id.* Killian repeated Woolverton's statement that he could not breathe to the video camera recorder and stated he had no injuries from the use of force. *Id.* Killian did not give any instructions to GRATZ about needed medical follow up before leaving the cell. *Id.*

> 12. *Defendants apparently failed to check on Woolverton from the time he was returned to a new cell until discovering him unconscious.*

The entire extraction process and medical examination occurred between 1:25 p.m. on October 22, 2013 and 2:02 p.m. on that day. Woolverton was found unconscious in his cell after 1:00 a.m. on October 23, 2013, approximately eleven (11) to twelve (12) hours later, and then later pronounced dead. Although inmate witnesses stated various officers approached Woolverton's cell to taunt him or laugh at him [ECF 240 at 70-102], it is unclear from the record whether anyone actually followed-up or checked on Woolverton following the use of force to make sure he did not have an asthma attack or was not continuing to decline.

## II.
## PLAINTIFF'S CLAIMS FOR RELIEF AGAINST GRUVER, GRATZ, AND SEYMOUR[7]

Plaintiff makes the following claims in his Amended Complaint:

1. Cruel and Unusual Punishment Under the Eighth Amendment for Deliberate Indifference to Woolverton's serious medical needs by:

    a. Failing to provide Woolverton adequate medical care for his Stage IV chronic kidney/renal disease from October 20-23, 2013; observing Woolverton in the days immediately preceding his death, and failing to act after noticing: weight

---

[7] The Court only lists the claims here that are NOT barred by the statute of limitations.

loss, weakness, swelling, complaints of pain, inability to catheter, failure to eat, incontinence, and lying on the floor in waste.

b.  Failing to temper force used on October 22, 2013; observing Woolverton during the use of force, and failing to respond appropriately after noticing: failure to respond to the OC spray, inability to stand or walk during and following cell extraction, and lying motionless covered in OC spray after returning to E-pod.

c.  The plaintiff also incorporated all of the below allegations related to his excessive force claim into his claim for deliberate indifference under the Eighth Amendment in his responsive brief.[8]

2. Cruel and Unusual Punishment Through Excessive Use of Force under the Eighth Amendment[9] by:

a.  Using OC spray on October 22, 2013 to extract Woolverton from his cell when he had serious medical needs, was on the "do not gas" list, and was "almost completely unresponsive" during the extraction process.

b.  Using a second application of OC spray on Woolverton after he was "almost completely unresponsive" and motionless after the first application of OC spray.

c.  GRUVER, GRATZ and SEYMOUR knew the OC spray could cause serious injury because of the "do not gas" classification.

d.  GRUVER, GRATZ and SEYMOUR chose to leave Woolverton covered in OC spray when they knew he could not decontaminate himself.

e.  GRUVER, GRATZ and SEYMOUR left Woolverton on the cold cell floor for almost ten (10) hours with no follow-up after he was sprayed with OC spray, with no clothing, towels or mattress on a cold night.

III.

---

[8] Although not stated in the Amended Complaint, plaintiff argues in his brief that GRATZ's action in placing the mask over Woolverton's face during the medical examination was an extension of the deliberate indifference in using OC spray on a "do not gas" prisoner in the first place.

[9] In the Amended Complaint, plaintiff does not assert a claim for relief under the Fourth Amendment for excessive use of force against Woolverton.

<u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A qualified immunity defense, however, alters the usual summary judgment burden of proof, such that governmental employees need only assert the defense in good faith, putting forth no evidence, to shift the burden to the non-movant to show the defense does not apply. *Davalos v. Johns*, 2013 WL 1820313, at *3-4 (N.D. Tex. Apr. 30, 2013)(citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). The non-movant must demonstrate how specific evidence in the record, and all reasonable inferences therefrom, viewed by the court in a light most favorable to the non-movant, presents a genuine, material fact dispute for trial regarding all essential elements of the claim(s). *Id.* at 4. "Conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment." *Id.* Plaintiff's failure to produce proof as to *any* essential element of the claim renders all other facts regarding that claim immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007). Summary judgment is mandatory as to the claim in question if plaintiff fails to meet this burden. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994)(en banc)(per curiam).

Qualified immunity is a defense that protects government officials from suit when they exercise the discretionary functions of their office. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815

(1982). In order to overcome a defense of qualified immunity, a plaintiff must establish that: "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established at the time of the challenged conduct,'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (citing *Ashcroft v. al-Kidd*, l31 S.Ct. 2074, 2080 (2011)). Plaintiff must demonstrate that the defendant's conduct was objectively unreasonable in light of the legal rules clearly established at the time of her actions. *Thomas v. City of Dallas*, 175 F.3d 358 (5th Cir. 1999). Conclusory allegations of wrongdoing will not satisfy these requirements. *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988). The court may examine these factors in any order. *Pearson v. Callahan*, 555 U.S. 223 (2009) *overruling in part Saucier v. Katz*, 553 U.S. 194 (2001). It is a plaintiff's burden to present evidence that a defendant is not entitled to qualified immunity when the defense is raised. *See Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001).

Claims of qualified immunity are not judged on twenty-twenty hindsight, or in light of knowledge ascertained after an event, but by looking through the eyes of the public official, considering what that official knew about the situation at the relevant time. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Poole v. City of Shreveport*, 691F.3d 624,630 (5th Cir. 20l2). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 34l (1986). "Pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *See Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) (emphasis in original omitted). If officers of reasonable competence could disagree as to whether

the plaintiff's rights were violated, the officer's qualified immunity remains intact. *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

IV.
## THE LAW ON EXCESSIVE FORCE AND DELIBERATE INDIFFERENCE UNDER THE EIGHTH AMENDMENT

### A. EXCESSIVE FORCE

In addressing an excessive force claim brought under section 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. *Baker v. McCollan*, 443 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged"). In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The validity of the claim must then be judged by reference to the specific constitutional standard that governs that right, rather than to some generalized "excessive force" standard. *Id.* (*cf. Tennessee v. Garner*, 471 U.S. 1 (1985) (claim of excessive force to effect arrest analyzed under a Fourth Amendment standard); *Whitley v. Albers*, 475 U.S. 312 (1986) (claim of excessive force to subdue convicted prisoner analyzed under an Eighth Amendment standard)).

In this instance, plaintiff alleges a violation under the Eighth Amendment for excessive force. The plaintiff does not appear to allege a violation of Woolverton's rights based on his physical removal from the cell to be taken to medical; rather, plaintiff objects to the manner of force used to extract Woolverton from the cell, which appears properly addressed under the Eighth Amendment standards on excessive force.

It is clearly established law that prison staff cannot act with deliberate indifference to a prisoner's "serious illness or injury." *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should also be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged. *Whitley*, 475 U.S. at 320. The deliberate indifference standard articulated in *Estelle* was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not *ordinarily* clash with other equally important governmental responsibilities. *Id*. However, the *Whitley* court recognized that sometimes responding to the medical needs of inmates can clash with "the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)). Woolverton's case presents a situation where prison guards were tasked with transporting an inmate with a history of sometimes violent non-compliance, who was housed in the administrative segregation section of the unit, to the medical department.

The "core judicial inquiry" into a plaintiff's claim of excessive force under the Eighth Amendment is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Martin v. Seal*, 510 F. App'x 309, 312 (5th Cir. 2013) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). The inquiry has two components: (1) an objective one that focuses on whether the alleged wrongdoing was nontrivial and harmful enough to violate the constitution and (2) a subjective one that focuses on the mental state of the alleged wrongdoer. *Hudson*, 503 U.S. at 7-8. The courts look to five nonexclusive factors to make this determination:

1. the extent of the injury suffered;
2. the need for the application of force;
3. the relationship between this need and the amount of force used;
4. the threat reasonably perceived by the responsible officials; and
5. any efforts made to temper the severity of a forceful response.

*Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998) (citing *Hudson*, 503 U.S. at 7). The Court

can consider these factors in any order. *Id*. "Excessive force claims are necessarily fact-intensive;

whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances

of each particular case.' " *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386,

396 (1989)).

The circumstances of this particular case involve the requirements for security personnel

to perform a strip search and secure a prisoner in handcuffs before opening the cell of a prisoner

located in an administrative segregation cellblock. The type of force used involves chemical

agents sprayed into a closed cell of an inmate who is not secured in handcuffs. The inmate in

question has a history of sometimes violent noncompliance with orders and a history of "playing

possum" and pretending to be sick and then "flipping the switch" and becoming violent with

staff; however, the inmate is also experiencing an urgent medical need according to medical

staff.

The Seventh Circuit has performed a detailed and instructive analysis of these types of

excessive force cases. It is a violation of the Eighth Amendment for prison officials to use mace

or other chemical agents in either quantities greater than that necessary or for the sole purpose of

punishment or the infliction of pain; nevertheless, the use of mace, tear gas, or other chemical

agent of like nature when reasonably necessary to prevent riots or escape or to subdue

recalcitrant prisoners does not constitute cruel and inhuman punishment even if the inmate is

locked in his prison cell or is in handcuffs. *See Soto v. Dickey*, 744 F.2d 1260, 1262-64 (7th Cir.

1984). The *Soto* court stated that the use of mace, in itself, is not a per se a violation of the

Eighth Amendment. *Id.* The court found that most of the instances of macing involved situations

where inmates were locked in their cells or in the strip cage and that most inmate conduct

violations were for disrespect and disobeying orders. *Id*. Additionally, the court found that

chemical agents were used against inmates who were throwing liquids from their cells, yelling

obscenities, refusing to remove a book from the butt of the door, refusing to return a meal tray,

refusing to properly submit to a strip search, and refusing to be double-celled. *Id*. The court

determined that the use of chemical agents in these circumstances can be appropriate prison

discipline and not necessarily used maliciously to cause harm because such use "prevent[s] a

*perceived future danger*." *Id*. at 1270 (emphasis added). Requiring compliance with officer

orders is part of insuring prison discipline, and the courts should be extremely hesitant in

"attempting to prohibit or limit the necessary means by which [prison guards] may carry out this

responsibility." *See id*. at 1270-71.

1. *The threat reasonably perceived by the responsible officials (the fourth factor)*

        In considering the plaintiff's claims, the undersigned finds it most useful to consider the

*Hudson* five-factor test in accordance with the chronology of events that occurred on October 22,

2013. The Court will first consider what threat was reasonably perceived by the officers that

constituted a need for the use of force, which is the fourth *Hudson* factor.

        The Court must always look at the context in which the force was used to determine if

such force was excessive. *See Baldwin v. Stalder*, 137 F.3d 836, 840 (5th Cir. 1998) ("Needless

to say, '[t]he amount of force that is constitutionally permissible ... must be judged by the context

in which that force is deployed' "); *see also Chambers v. Johnson*, 372 Fed. Appx. 471 (5th Cir.

2010) (recognizing that if, as the plaintiff asserted, he complied with the orders of security

officers, "then the defendants could not have reasonably perceived any threat requiring a need to use force"); *Peterson v. Peshoff*, 216 F.3d 1079 (5th Cir. 2000) (finding that an inmate's plaintiff's claim "that correctional officers used excessive force by wantonly and maliciously spraying him with mace without provocation while he was confined in his cell" was not frivolous).

Here, plaintiff alleges the force was excessive because GRATZ and SEYMOUR could not have perceived a threat from Woolverton because of their observations of his deteriorating mental and physical condition. However, the Court finds that Woolverton's history of noncompliance with orders, Woolverton's housing assignment, and a lack of specific knowledge of Woolverton's medical conditions by these officers show that GRATZ and SEYMOUR reasonably perceived a threat in transporting Woolverton to the medical department without first securing him in hand and feet restraints. GRUVER did not personally witness the extraction and only observed Woolverton for approximately 30 seconds earlier in the day before authorizing an extraction team and chemical agents if necessary; however, plaintiff has raised a fact question about GRUVER's knowledge of Woolverton's asthma condition prior to the authorization of the use of chemical agents.

The district court in *Thomas v. Walton*, recognizing that it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents either in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain, held that a prisoner's repeated refusal to comply with order to submit to a strip search during a cell inspection justified spraying him with a chemical agent, such that the spraying did not involve the use of excessive force. 461 F. Supp. 2d 786 (S.D. Ill. 2006). The court noted that not only were the chemical agents not used in a quantity greater than necessary to subdue the prisoner,

secure his compliance with the order, and assure the safety of the officers, but also that the
prisoner was being held in segregation in a maximum security prison and had a history of
assaults on correctional officers. *Id*. In so holding, the court stated, in an excessive force case, an
inmate's disciplinary history, as well as the fact that the incident implicating alleged excessive
force involved an inmate in segregation at a maximum security institution, is relevant to the issue
of the appropriateness of the force used. *Id*.  The Court finds that Woolverton's history and
housing assignment also make the use of chemical agents justifiable in these circumstances,
based on the officers' reasonable reliance on medical personnel's presence to notify them of any
contraindications in using OC spray.

On October 22, 2013, officers GRATZ and SEYMOUR were told by medical staff that
Woolverton was refusing to submit to required restraint procedures to be taken to a necessary
medical appointment. Specifically, Killian told GRATZ that Woolverton had to be removed from
his cell to go to medical, by doctor's orders. [ECF 229 at 13]. Killian told GRATZ and
SEYMOUR that Woolverton was refusing a strip search and refusing to comply with restraint
procedures in order to go to medical. [ECF 229 at 71]. Although inmate witnesses heard GRATZ
respond with comments like "f—him," and "I'm not doing s--- for him, he can die all I care
[sic]," and these witnesses saw GRATZ approach Woolverton's cell and threaten to gas him if he
did not get up, these statements and actions by GRATZ do not show he failed to perceive
Woolverton as a threat or show that GRATZ failed to act on KILLIAN's request. [Rashid
Grievance and Statement, Palomo Statement, Currenton Statement, ECF 240 at 73, 86, 94, 97].

The question before the Court as to this *Hudson* factor is to what extent the plaintiff has
raised a fact question that GRUVER, GRATZ and SEYMOUR should have realized Woolverton
could not comply with verbal orders and/or was not a threat to the safety of TDCJ staff if they

entered his cell without him complying with strip search and restraint procedures. The Court finds this factor weights in favor of GRUVER, GRATZ, and SEYMOUR. Plaintiff has failed to raise a fact question that GRUVER, GRATZ or SEYMOUR had knowledge of Woolverton's medical conditions sufficient to determine that Woolverton posed no threat to TDCJ staff during a cell extraction without restraints or a strip search.

Plaintiff has not pointed to any evidence either showing officers are responsible for reviewing medical records in situations where units have 24 hour medical personnel on staff or that GRATZ, GRUVER, or SEYMOUR did have knowledge of Woolverton's medical condition on October 22, 2013 beyond the need to be seen by medical staff. To the extent that GRUVER might have known about Woolverton's asthma condition by reviewing the October 7, 2013 Use of Force video prior to authorizing chemical agents if necessary during the extraction, plaintiff has not pointed to any evidence that GRUVER had knowledge that asthma would have rendered Woolverton less of a threat during the extraction.

GRUVER only observed Woolverton for approximately thirty (30) seconds prior to authorizing the use of force. [ECF 229 at 41, 43-44]. GRUVER testified he knew Woolverton to be "one of the most aggressive inmates," "a discipline problem," and "to have violent outbursts" based on past interactions with Woolverton and based on his housing assignment, which influenced GRUVER's decision to authorize an extraction team and chemical agents. [ECF 229 at 46, 48]. GRUVER had previously authorized the use of chemical agents on Woolverton. *Id*.

GRATZ specifically testified that Woolverton had a history of "playing possum" where he would pretend to be very sick, and then get violent when someone entered his cell. [ECF 229 at 8-9]. GRATZ testified he had no knowledge of Woolverton's medical conditions at any time during or before the extraction took place and did not ask anyone about Woolverton's medical

condition prior to the extraction. [ECF 229 at 22-23].

SEYMOUR testified that at no time did Woolverton state was sick, could not get up, or did not feel good, indicating he could not comply while SEYMOUR attempted to get Woolverton to comply with orders to be restrained; and he (SEYMOUR) would not have used force if he believed Woolverton was too sick to comply. [ECF 240 at 167]. Killian stated she did not tell GRATZ, GRUVER, or SEYMOUR about Woolverton's medical conditions at any time prior to the use of force. [ECF 240 at 122-123]. The Plan allows restraint to be used to accomplish medical treatment "if an offender refused medical treatment that licensed medical staff believes is necessary for the safety of the offender." [ECF 240 at 193]. The Plan authorizes the use of chemical agents "if lesser means have proven ineffective" on an inmate "who refuses to obey a lawful order." [ECF 240 at 193]. GRATZ and SEYMOUR notified "the highest-ranking shift supervisor on duty" to gain authorization to use chemical agents and an extraction team. [ECF 229 at 13].

The Court finds that GRUVER, GRATZ, and SEYMOUR reasonably perceived a potential threat in failing to secure Woolverton in restraints and conduct a strip search prior to transporting him to the medical department on October 22, 2013. TDCJ officials chose to house Woolverton in the administrative segregation unit. These officers had knowledge of Woolverton's history of "playing possum" and having violent outbursts in the past. Medical staff failed to advise these officers that Woolverton might not be able to comply with orders given his mental and physical condition.

### 2. *The need for the application of force (the second factor)*

"[Prison officials] are entitled to wide-ranging deference." *Baldwin v. Stalder*, 137 F.3d 836, 840 (5th Cir. 1998) (finding that the use of mace to quell a disturbance caused by inmates

on a bus did not constitute excessive force). The use of force does not constitute cruel and unusual punishment when reasonably necessary to subdue a recalcitrant prisoner. *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975); *see also Williams v. Hoyt*, 556 F.2d 1336, 1339-40 (5th Cir. 1977) (affirming jury verdict for the defendants where evidence was sufficient to show that mace was used only for the control of unruly prisoners and was, therefore, not excessive). OC spray is normally considered the minimal amount of force that can be used after verbal intervention, and is generally considered appropriate to use on non-compliant prisoners because the effects of the spray are minimal and short-term. [ECF 229, TDCJ Use of Force Plan at 83-84]. Without knowledge that OC spray should *not* be used on a particular prisoner, officers would not be acting contrary to "clearly established" statutory or constitutional guidelines in using this type of force. Even the plaintiff's own expert, Jeffrey Schwartz, stated that "chemical agents are typically the safest first alternative in an extraction situation." [ECF 240 at 226]. Schwartz did highlight the exception involving situations where use of such agents was contraindicated, specifically when an inmate has asthma. *Id.* However, the issue remains whether a fact question exists as to GRATZ and SEYMOUR's knowledge that Woolverton had asthma.

Therefore, the question before the Court is to what extent the plaintiff has raised a fact question regarding GRUVER, GRATZ, or SEYMOUR's knowledge that an application of OC spray (or multiple applications) would be contraindicated to use on Woolverton on October 22, 2013, prior to the application of the OC spray.

GRATZ and SEYMOUR testified not only that they had no knowledge of any of Woolverton's medical conditions during or prior to using force on him to extract him from his cell, but also that they had no reason to contact medical to determine any contraindications for use of force because Killian was present to tell them of any issues they needed to know. [ECF

240 at 18, 59, 158-159, 184]. Again, the Court notes that Killian stated she did not tell GRATZ, GRUVER, or SEYMOUR about Woolverton's medical conditions. [ECF 240 at 122-123].

Plaintiff argues that GRATZ was "most familiar" with Woolverton, based on daily interactions with him as supervisor of the E-pod. Plaintiff argues that Woolverton's "docility" on October 22, 2013 is sufficient evidence to show that GRATZ should have known Woolverton was too weak to pose a risk to TDCJ staff. The Court finds this argument unavailing. Although inmate witnesses stated they observed markedly unusual behavior by Woolverton in the two days prior to October 22, 2013, this is insufficient evidence by plaintiff to create a fact question as to GRATZ or SEYMOUR's own knowledge of Woolverton's inability to pose a threat on the day in question. [ECF 240 at 76-102]. Plaintiff has not pointed to specific summary judgment evidence before the Court that evinces any specific interactions between Woolverton and GRUVER, SEYMOUR or GRATZ between the time Woolverton flooded his cell on October 19, 2013 and when Killian notified GRATZ that Woolverton must be transported to medical around noon on October 22, 2013. GRATZ acknowledged that he supervised the E-pod where Woolverton was housed, but plaintiff has the burden to point the Court to specific interactions between GRATZ, SEYMOUR or GRUVER and Woolverton during this time period to illustrate to the Court that any of these defendants had specific knowledge of Woolverton's weakened condition. Although plaintiff alleges and has provided summary judgment evidence regarding Woolverton's weight loss, failure to eat, complaints of pain, inability to catheter, and other signs of Woolverton's deteriorating health, plaintiff has not raised a fact question that GRUVER, GRATZ, or SEYMOUR had specific knowledge of this deterioration and how such a decline in health indicated that Woolverton was no longer a security threat given Woolverton's history discussed above.

GRATZ knew that Woolverton was housed in the E-pod because of past non-compliant and aggressive behavior toward TDCJ staff. [ECF 229 at 79]. GRATZ and GRUVER both stated they were familiar with Woolverton's history of spitting on officers and spitting toward the cell door in an attempt to transmit diseases to the officers. [ECF 229 at 21, 46-47]. Additionally, the video showed that Woolverton, although markedly weak, did sit up at times and was verbal at times; therefore, plaintiff's arguments that he was "almost entirely unresponsive" are conclusory and do not raise a fact question regarding GRATZ and SEYMOUR's knowledge of Woolverton's inability to comply with verbal commands on the afternoon of October 22, 2013. GRUVER was not present during the actual extraction, but did authorize chemical agents.

Additionally, plaintiff places the burden on GRATZ and SEYMOUR to question medical staff about Woolverton's condition prior to using OC spray. However, Killian was present at the scene, and pursuant to TDCJ's Plan for using force, Killian had the responsibility to advise GRATZ and SEYMOUR of any contraindications. Killian admitted she did not do so. [ECF 240 at 122-123]. The Court finds no material fact question exists that overcomes GRATZ and SEYMOUR's entitlement to qualified immunity as to the Eighth Amendment excessive force claims. The expert opinion that Woolverton might have had an altered mental state and be unable to comply with orders, ECF 240 at 264-272, does not show that GRUVER, GRATZ, or SEYMOUR should have known about this condition or that they realized they could not use chemical agents on an offender "who [is] incapable of responding to commands and orders being given to them by staff." [ECF 240 at 193].

  3.  *The relationship between the need for force and the amount of force used (factor three)*

This factor is closely linked to the second factor of *Hudson* in this particular case, because if any force at all was reasonable under these circumstances, then the Court finds that an

application of OC spray, even two applications, would be the standard minimum amount of force after verbal intervention (which was attempted) for these officers under clearly established precedent. Only if GRATZ and SEYMOUR could clearly perceive that Woolverton posed no threat to the safety of TDCJ staff would the use of OC spray constitute excessive force on an inmate with Woolverton's history of non-compliance and aggression. As discussed above, GRATZ and SEYMOUR had no knowledge of Woolverton's medical conditions sufficient to raise a fact question concerning the use of chemical agents on Woolverton. However, the amount of force necessary is affected by Woolverton's asthma.

GRUVER indicated that Killian told him that Woolverton needed to be seen by medical, and GRUVER felt he had no choice but to extract Woolverton from his cell. [ECF 229 at 40]. Killian also agreed she "didn't care how he got there [to the doctor]" because Woolverton's need to see a doctor was so urgent. [ECF 240 at 114]. However, GRUVER had knowledge that was not available to GRATZ or SEYMOUR. GRUVER testified that he had recently reviewed the October 7, 2013, use of force video regarding Woolverton, shortly before the October 22, 2013 incident occurred. [ECF 229 at 46-48]. On that video, Woolverton's asthma condition was clear. [video2 at 4:30-5:45]. Plaintiff has raised a fact question of GRUVER's knowledge of Woolverton's asthma condition by asserting that GRUVER had reviewed all the use of force evidence from the October 7, 2013 incident. GRUVER testified that the guards had "constant" consultation with medical during the entire use of force process. [ECF 240 at 206]. Plaintiff's evidence contained the Plan for using force at the Clements Unit, which attributes to GRUVER the knowledge that OC spray is not permitted where "use of chemical agents would be detrimental to the mental or physical health of the offender." [ECF 229 at 84]. Finally, plaintiff submitted an expert report, prepared by TDCJ use of force expert Jeffrey Schwartz, opining that

TDCJ supervisors should have knowledge that chemical agents should not be used as a first line force on inmates with asthma. [ECF 240 at 226]. This specifically creates a fact question of whether GRUVER was aware that OC spray did not constitute lesser force in Woolverton's case. It is because this fact question exists, that the Court finds granting summary judgment to GRUVER on the plaintiff's Eighth Amendment excessive force claim is not merited.

4. *The efforts made to temper the severity of the force used (factor five)*

Prior to the first and second applications of OC spray, multiple individuals attempted verbal intervention with Woolverton. The question before the Court is to what extent plaintiff has raised a fact question that no force beyond verbal intervention was appropriate under the circumstances for GRATZ and SEYMOUR.

As seen in the October 22, 2013 video, GRATZ and SEYMOUR attempt to use verbal intervention to get Woolverton to comply with a strip search and to approach the door to be handcuffed. [video1 at 1:42-2:00, 2:50-2:55 (GRATZ), 2:22-2:40, 3:11-3:24 (SEYMOUR)]. The video showed four times that SEYMOUR and GRATZ attempted verbal intervention before the first application of OC spray was deployed [*Id.*] SEYMOUR stated he and GRATZ asked Woolverton to comply approximately six times before OC spray was deployed, some prior to the camera rolling. [ECF 229 at 62]. SEYMOUR also stated Killian attempted to get Woolverton to comply before the recording process started. *Id.* Killian also stated she tried to get him to comply. [ECF 229 at 96]. When these attempts failed to gain Woolverton's compliance, SEYMOUR warned Woolverton that OC spray would be deployed if he did not comply. [video1 at 3:15-3:24]. According to GRATZ and SEYMOUR, who were seen pressing their ears to the cell door and looking inside of it, Woolverton rocked back and forth on the cell floor and verbally responded that he would comply, but did not stand up. [*Id., ECF 229 at 17]. The Court

finds that because the use of OC spray is the minimal amount of force (when there is no knowledge by the guards that chemical agents are contraindicated) after verbal intervention, GRATZ and SEYMOUR attempted multiple times to avoid using even that amount of force by attempting verbal intervention.

After the first application of OC spray, SEYMOUR and GRATZ again attempted verbal intervention to get Woolverton to comply with orders. [video1 at 4:00-7:25]. The Plan allows for security staff to use more than one application of chemical agents to secure compliance with verbal orders. [ECF 229 at 198]. Even after the second application of OC spray and before the extraction team entered Woolverton's cell, GRATZ and SEYMOUR reinforced that the "minimum amount of force necessary" should be used to extract Woolverton from the cell. [video1 at 9:00-10:15]. The extraction team did not kick, strike, or pin Woolverton during the extraction. *Id*. at 10:15-20:25. No allegations of any injuries from the physical removal of Woolverton from his cell have been made or were documented on the autopsy or medical records. The only force alleged to be excessive are the chemical agents.

Again, had GRUVER or Killian informed GRATZ or SEYMOUR about Woolverton's asthma, they might have known that using chemical agents was contraindicated in this situation. However, the Court finds that absent a showing that GRATZ or SEYMOUR knew about Woolverton's asthma, the two applications of OC spray were not excessive in attempting to gain Woolverton's compliance with verbal orders in order to prevent the perceived threat of violence if they transported him to the medical department without first securing him and performing a strip search.

   5. *The extent of the injury suffered (factor one)*

Upon review of the summary judgment evidence, this factor presents a fact question that weighs in favor of the plaintiff. Although the autopsy report submitted as summary judgment evidence does not indicate that Woolverton died because of a reaction to OC spray, the report does state, "…the lungs show moderate congestion and edema." [ECF 229 at 90]. Further, plaintiff's expert, Dr. Beam, stated, "the application of OC spray without the patient's asthma being considered was against [TDCJ] protocol. I doubt that it alone caused death but believe that it accelerated the death of this already failing man." [ECF 240 at 274]. The plaintiff's expert opinion evidence, combined with the autopsy report and excerpts of medical records [ECF 240 at 137-151], create a fact question about the extent of the injury caused to Woolverton by two applications of OC spray, placing a mask over his mouth and failing to decontaminate him of OC spray. Ultimately, it is clear that Woolverton died shortly after these events from a progressive kidney disease, which may have been exacerbated by the use of force. The Court must draw all inferences in favor of the plaintiff, and plaintiff has presented enough summary judgment evidence to raise a fact question that injury was caused to Woolverton by the use of OC spray and lack of decontamination. By raising this fact question, plaintiff has not defeated entitlement to qualified immunity; even if a significant injury was caused by the use of force, the plaintiff must still show the force used was excessive to the threat perceived.

As discussed above, plaintiff has not raised a fact question that the use of chemical agents on Woolverton by GRATZ and SEYMOUR was excessive, absent a showing of specific knowledge of his medical conditions. However, plaintiff has raised a fact question for GRUVER, given his possible knowledge of Woolverton's asthma. Because plaintiff has also raised a fact question regarding the severity of the injury sustained by Woolverton as a result of the use of chemical agents, plaintiff has defeated GRUVER's entitlement to qualified immunity at the

summary judgment level.

B.  DELIBERATE INDIFFERENCE

Deliberate indifference "is an extremely high standard to meet." *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 882 (5th Cir. 2004). ("We begin by emphasizing that our court has interpreted the test of deliberate indifference as a significantly high burden for plaintiffs to overcome."). A prison official acts with deliberate indifference "only if (A) he knows that inmates face a substantial risk of serious bodily harm and (B) he disregards that risk by failing to take reasonable measures to abate it."[10] *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)); *see also Reeves v. Collins*, 27 F.3d 174, 176–77 (5th Cir. 1994). Unsuccessful medical treatment, acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. *Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999); *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

1.  *GRATZ and SEYMOUR were not medically trained personnel, and as laymen they reasonably relied on medical staff to provide Woolverton with needed care and to advise against force that was medically contraindicated.*

A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious

---

[10] This two-part test for deliberate indifference requires *both* knowledge of a substantial risk of serious bodily harm and a conscious disregard of the known risk. As the Court considers the actions of GRATZ, SEYMOUR, and GRUVER below, the Court first considers whether they knew, or should have known, of a substantial risk to Woolverton's health as a result of any actions they took or failed to take on the dates in question. As the Court determines below that these three defendant officers did not have knowledge of a substantial risk to Woolverton, the Court finds it unnecessary to consider the second part of the deliberate indifference analysis. Without knowledge of the risk, the officers could not have consciously disregarded that risk.

medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). The Fifth Circuit has

defined a "serious medical need" as "one for which treatment has been recommended or for

which the need is so apparent that *even a layman* would recognize that care is required." *Gobert*,

463 F.3d at 345 n.12 (emphasis added). Here, the competent summary judgment evidence

indicates that medical staff was involved throughout the use of force on October 22, 2013, and

had provided Woolverton care for chronic kidney disease, asthma and other mental health

conditions on the days preceding the use of force. GRUVER, GRATZ, and SEYMOUR were

aware that medical staff were present during and following the use of force.

    *Gobert* requires a medical need to be so serious that even a "layman" would recognize

the need for further care in order to meet the deliberate indifference standard. 463 F.3d at 345

n.12. By adopting this standard, the Fifth Circuit has joined other circuits in the doctrine of

reasonable reliance on medical personnel in deliberate indifference cases. A prison official may

rely on a medical professional's opinion if such reliance is reasonable. *Meloy v. Bachmeier*, 302

F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less

medical training to second-guess or disregard a treating physician's treatment decision.").

"Except in the unusual case where it would be evident to a layperson that a prisoner is receiving

inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of

medical professionals." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). It has been

clearly established for over a decade that *unreasonable* reliance on the advice of a medical

professional will not excuse deliberate indifference to a prisoner's serious medical needs. *Spruill*

*v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004); *Hamilton v. Endell*, 981 F.2d 1062, 1066-67 (9th Cir.

1992) ("By choosing to rely upon a medical opinion which a *reasonable person* would likely

determine to be inferior, the prison officials took actions which may have amounted to the denial

of medical treatment, and the unnecessary and wanton infliction of pain.") (quotation omitted).

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious; however, that risk must be obvious from the specific facts known to the defendant in this particular circumstance. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

> The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health, and *it does not matter whether the risk comes from a single source or multiple sources*, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

*Id.* at 843 (internal quotation omitted and emphasis added). Thus, the risk must be cognizable, but the consequences of that risk need not yet have materialized, in order to define the time to begin to determine whether the defendant disregarded the risk. *See Gates v. Cook*, 376 F.3d 323, 341 (5th Cir. 2004) (holding that an Eighth Amendment plaintiff did not have to prove that he was actually injured by exposure to raw sewage, only that such exposure posed a serious health risk). Rather, the defendant's action or inaction before the risk is realized remains relevant to the analysis of deliberate indifference. "A remedy need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

In this case, the question before the Court is the knowledge *GRATZ and SEYMOUR* had that using OC spray to extract Woolverton from his cell would pose a serious health risk. There are also other actions (or inactions) taken by officer GRATZ –placing a spit mask over Woolverton during his medical examination and failing to assist Woolverton with

decontamination procedures—that raise potential Eighth Amendment questions. The medical records attached to other motions before the Court will not be considered as part of this motion; rather, the Court will consider the evidence presented to the Court concerning what these defendants actually knew regarding Woolverton's medical conditions.

When seeking approval to use force to extract Woolverton from his cell, GRATZ first contacted Assistant Warden David, who told him to contact GRUVER, and then GRATZ contacted GRUVER. The "highest ranking shift-supervisor" had the responsibility to speak with medical about the use of OC spray before authorizing the use, according to the Plan. [ECF 240 at 196]. The evidence shows that GRATZ contacted GRUVER to secure authorization to use chemical agents, because GRUVER was the shift-supervisor. [ECF 229 at 13].   GRATZ spoke to Killian first and then left SEYMOUR to speak with Killian while he went to discuss the situation with GRUVER. [ECF 229 at 13].

GRATZ and SEYMOUR stated they had no knowledge of any of Woolverton's medical conditions during or prior to using force on him to extract him from his cell and further that they had no reason to contact medical to determine any contraindications for use of force because Killian was present to advise them as to any issues they needed to know. [ECF 240 at 18, 59, 158-159, 184].

GRATZ and SEYMOUR followed the Plan by contacting GRUVER for authorization and ensuring medical was present during the extraction process. GRATZ and SEYMOUR relied on medical to inform them of any contraindications in using OC spray on Woolverton. GRATZ specifically testified that Woolverton had a history of "playing possum" where he would pretend to be very sick, and then get violent when someone entered his cell. [ECF 229 at 8-9]. GRATZ also indicated that verbal intervention typically worked on Woolverton and that GRATZ had

never had to use OC spray to get Woolverton to comply in the past and did not want to have to use spray on October 22. [ECF 229 at 34]. Unless a layperson would have been able to determine that Woolverton had an altered mental state such that he *could not* comply with verbal orders, even when he verbally stated he would comply, then GRATZ and SEYMOUR were reasonable to rely on Killian to inform them whether OC spray was not the appropriate minimum force necessary to secure compliance.

Plaintiff's expert states that *medically trained individuals who had knowledge* of Woolverton's medical records and kidney failure, would have been able to determine that Woolverton had mental impairment as a result of his impaired kidney function, and that it was this impairment that caused Woolverton to be *unable* to comply with orders. [ECF 240 at 268-269 (emphasis added)]. However, plaintiff bears the burden to show defendants actually knew of the substantial risk of harm to Woolverton in using OC spray by showing either they knew of his medical conditions because they were obvious to a layperson or had actual knowledge of them in order to raise a fact question that they acted contrary to clearly established law. Otherwise, defendants' reliance on the information provided to them by Killian is reasonable.

Institutional staff who are not medical providers are not liable when they rely on the medical expertise of medical staff. *See Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1050 (11th Cir. 2014); *see also Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) (the law with respect to prisoners' Eighth Amendment deliberate indifference claims encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so); *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (a claim of medical indifference cannot generally be against non-medical personnel, unless they personally involved themselves with a

denial of treatment or deliberately interfered with the medical treatment). The law does not require that non-medical officials ignore the determination and recommendation of medical staff. *See Keith*, 749 F.3d at 1050; *see also Miltier*, 896 F.2d at 854 (prison officials are entitled to rely upon prison medical personnel to determine the medically proper course of treatment for an inmate, unless there is direct evidence to show that a warden or other supervisory official should not rely on this expertise); *see also, e.g., Williams v. Limestone Cnty., Ala*., 198 F. App'x 893, 897 (11th Cir. 2006) ( "[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care."). Unless, that is, a detainee's medical need is so obvious and so serious that even a layperson would know that the medical care offered (or withheld) ignores a substantial risk of serious harm. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (nonmedical defendants may be liable if " 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.' ") (quoted cites omitted); *Greeno v. Daley*, 414 F.3d 645, (7th Cir. 2005).

Plaintiff has not established that Woolverton's asthma condition was "so obvious" to GRATZ or SEYMOUR at any time during their interactions with him on October 22, 2013. Neither has plaintiff shown that a layman should be able to determine Woolverton's mental conditions based only on daily interactions with a sometimes compliant, sometimes non-compliant and threatening Woolverton.

GRATZ also took the action of placing a mask over Woolverton's face during the medical examination. [video1 at 24:25]. GRATZ testified he placed the mask over Woolverton's face in a preemptive move to protect his officers and medical staff from being spit upon, but GRATZ admitted he could not clearly see if Woolverton was actually trying to spit on anyone. [ECF 229 at 21]. Plaintiff's medical expert states that mucus build-up is an after effect of OC

spray and Woolverton should not have had a masked placed over his mouth as an asthmatic. [ECF 240 at 272]. However, GRATZ placed the mask on Woolverton in full view of Dr. Bittle and Killian, who did nothing to object or remove the mask. [video1 at 24:25-30]. Plaintiff has failed to raise a fact question that GRATZ acted with malicious intent, rather than as a measure to ensure discipline and order. This is not an instance where GRATZ placed or left the mask on Woolverton *after* being informed that he was an asthmatic and the mask could harm Woolverton.

GRATZ and SEYMOUR were both present in accompanying Woolverton back to a new cell after medical cleared him for return to his cell. Although GRATZ explained decontamination procedures to Woolverton, it appeared from the video that Woolverton very possibly could not decontaminate himself. [video1 at part 2, 1:22-6:00]. The Plan states that force shall not be used to decontaminate a prisoner. [ECF 240 at 199]. The Plan is unclear about whether medical personnel or officers should help an individual decontaminate after OC spray or explain decontamination procedures to them.[11]  However, the Court finds it was reasonable that GRATZ and SEYMOUR could rely on Killian to determine if decontamination was medically necessary.

Plaintiff failed to raise a fact question that GRATZ or SEYMOUR knew of Woolverton's medical conditions such that they understood and disregarded the serious risk of leaving an asthmatic covered in OC spray. Further, there were no medical orders to decontaminate Woolverton, and the Plan requires a security officer to refrain from using additional force to decontaminate an inmate. Plaintiff cannot show a fact question that GRATZ and SEYMOUR acted contrary to clearly established law in relying on medical. Although plaintiff's expert, Jeffrey Schwartz, provides a statement that "Lt. Seymour observed the medical person do

---

[11] The Plan provides "all affected individuals shall be examined *by licensed medical staff*, properly decontaminated *or* advised as to proper decontamination procedures, and offered a change of clothing." [ECF 240 at 199 (emphasis added)].

nothing" and the "choice to 'defer to medical' was an abdication of his duty to provide for the safety of the prisoner that would have been obvious to any reasonable person, especially one with his degree of experience and training," [ECF 237, p, 332], the Court finds this statement does not raise a fact question. The Court is unclear whether the expert intends to state GRATZ failed to decontaminate Woolverton himself when Killian failed to do so, or whether the expert is stating SEYMOUR might have been standing outside the cell at the time, or whether the expert confused the two defendants; regardless, the Court does not consider this statement to raise a fact question.

Schwartz's statement is a legal conclusion regarding GRATZ or SEYMOUR's choice to defer to medical and does not comply with the rules regarding expert testimony as competent summary judgment evidence; it does not provide the Court with an indication that SEYMOUR or GRATZ actually knew of Woolverton's medical conditions and intentionally disregarded them and therefore acted contrary to clearly established law. The Federal Rules do not permit expert witnesses to offer legal conclusions. *C.P. Interests, Inc. v. Cal. Pools, Inc*., 238 F.3d 690, 697 (5th Cir. 2001). Schwartz opined that SEYMOUR testified that Killian's statement to the camera that Woolverton claimed he had trouble breathing upon return to the E-pod was merely Killian reiterating Woolverton's statements. [ECF 237 at 332]. Schwartz then stated that SEYMOUR's observation that Killian did not provide immediate further care for Woolverton indicated to SEYMOUR that Killian's medical care was deficient. *Id*. The Court rejects this reasoning. SEYMOUR and GRATZ are laymen and would not really know if this level of care was deficient, especially given the lack of evidence regarding their knowledge of Woolverton's specific medical conditions. The clearly established law requires the plaintiff to raise a fact question regarding SEYMOUR or GRATZ's actual knowledge of the serious risk created by

Woolverton's *asthma* (or other specific medical conditions) in order to create a duty to act, and
plaintiff has failed to do so.

2. *GRUVER was not medically trained and although he potentially had knowledge of
   Woolverton's asthma diagnosis, he reasonably relied on medical staff to provide
   Woolverton medical care.*

After GRATZ first contacted him about the situation, GRUVER returned to the cell with

GRATZ to briefly observe Woolverton. [ECF 229 at 41, 43-44]. GRUVER looked into the cell

(for approximately 30 seconds) and saw Woolverton's legs moving back and forth, as he lay on

the ground. *Id*. GRUVER gave approval for both an extraction team and OC spray. [ECF 229 at

16]. GRUVER spoke with Killian prior to giving the order authorizing the use of OC spray.

[ECF 229 at 39-40]. Both GRUVER and Killian testified that Killian did not specifically

mention Woolverton's asthma or object to the use of OC spray when they spoke prior to the

authorization. [ECF 240 at 122, 206-207]. However, the evidence indicates that GRUVER did

not specifically ask Killian if OC spray was contraindicated, as required by the Plan. [ECF 240 at

197]. As discussed above, only GRUVER had potential knowledge of Woolverton's medical

conditions prior to the use of OC spray on Woolverton. GRUVER was not present during the

actual extraction.

GRUVER was not present during the use of force and was not present when Woolverton

was placed back into a new cell.   GRUVER did not observe the medical examination by Dr.

Bittle or the care provided by Killian. GRUVER's knowledge was that Woolverton was being

taken to the medical department to receive care and the need for medical care was urgent enough

that Woolverton could not refuse to go to the medical department. There is no evidence in the

record that GRUVER had knowledge about what specific medical care was provided to

Woolverton during the examination by Dr. Bittle or following the examination later that day.

Additionally, there is no evidence in the record that GRUVER observed signs of Woolverton suffering an asthma attack or other specific emergency symptoms and failed to act.

Inmate witness statements show "the warden and the major and some other people" visited Woolverton in his new cell after his return from his medical examination on October 22, 2013, and made negative comments. [Unknown Inmate Statement, ECF 240 at 71]. Those statements are as follows: "I observed the wardens, major and others go to the cell and laugh at him in distress" [Rashid Grievance, ECF 240 at 76]; "The Warden Beach came in E-Wing went to his cell and made derogatory statements to him, and us [as] a whole such as 'anybody else want some?!'" [Jackson Statement, ECF 240 at 85]; "Several guards came into the unit went to [Woolverton's] cell and made jokes about his lying nude on the floor" [Palomo Statement, ECF 240 at 87]; and "I don't know who the officers were, but a few of them walked in on E-wing and went to E-122 cell. What they did there I couldn't see because I lived on 205, second tier." [Ventura Statement, ECF 240 at 96]. The Court will assume *arguendo* and for purposes of this analysis, that GRUVER is the major referenced in these statements who visited Woolverton at his new cell and either laughed at him, made jokes to other officers, or made derogatory comments.

Verbal abuse and threatening language do not give rise to a section 1983 claim. *See White v. Gutierez*, 274 Fed. Appx. 349 (5th Cir. 2008) (citing *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (verbal abuse by a prison guard does not give rise to a cause of action under section 1983)). To the extent that plaintiff argues GRUVER's actions in returning to the cell or making comments constitutes deliberate indifference, plaintiff has failed to raise a fact question regarding GRUVER's knowledge of Woolverton's continuing medical need. GRUVER was not present to observe what level of care was provided to Woolverton by medical during the

examination or upon his return to the cell.

Even plaintiff's use of force expert, Schwartz, described chemical agents as, "typically the safest first alternative in an extraction situation." [ECF 240 at 226]. The effects of OC spray are described as "instant" and include "acute burning and closing of the eyes, along with inflammation of mucous membranes and upper respiratory system." [ECF 240 at 198]. Although plaintiff has raised a fact question that GRUVER may have realized Woolverton had asthma from his viewing the October 7, 2013 use of force video on Woolverton prior to October 22, 2013, and that OC spray might not therefore constitute "lesser force" on an asthmatic, plaintiff has not raised a fact question that GRUVER had knowledge that lack of decontamination of OC spray *after examination by medical staff following its use* might be problematic for an asthmatic.

The Court distinguishes between GRUVER's actions that raise an Eighth Amendment claim for excessive force (his failure to attempt interventions beyond the use of chemical agents on Woolverton considering GRUVER's knowledge of Woolverton's asthma) and GRUVER's actions regarding Woolverton's medical needs. Specifically, the best summary judgment evidence before the Court regarding GRUVER's actions is the Plan, which discusses GRUVER's duties in executing a use of force involving chemical agents. The Plan clearly articulates that GRUVER had a duty to consult with medical staff about contraindications before authorizing chemical agents; thus, his failure to ask questions of Killian about Woolverton's asthma raises a fact question about excessive force. On the other hand, the Plan forbids the use of force in actively decontaminating a prisoner of chemical agents after a use of force. Additionally, GRUVER's knowledge that Woolverton had been seen by medical staff during and after the use of chemical agents, and his lack of knowledge of any additional required follow-up care, allowed him to reasonably rely on medical staff to determine if additional care was needed during the

application of chemical agents and afterwards. Furthermore, the Plan indicates that the effects of OC spray generally dissipate within thirty minutes. According to the timeline indicated by the video and witnesses, GRUVER's return to Woolverton's new cell was well after thirty minutes had elapsed from the use of chemical agents. There is no evidence that GRUVER observed specific symptoms displayed by Woolverton that would indicate to a laymen that further care, medical or otherwise, was needed.

Although plaintiff's experts acknowledge that medically trained personnel would realize this could pose a serious risk, GRUVER was not medically trained. GRUVER was not made aware of any orders by medical to provide follow-up care to Woolverton. Plaintiff has not articulated specific facts in the record, in the face of GRUVER's assertion of qualified immunity and denial of any actual knowledge of Woolverton's medical needs, to show that GRUVER knew of the substantial risk of serious harm to Woolverton by failing to provide any additional care. Plaintiff has not stated an Eighth Amendment claim for deliberate indifference against GRUVER.

## V.
### RECOMMENDATION

For the reasons set forth above, it is the RECOMMENDATION of the Magistrate Judge to the District Judge that the "Motion for Summary Judgment on the Defense of Qualified Immunity" filed by defendants GRUVER, GRATZ, and SEYMOUR be GRANTED IN PART and DENIED IN PART. Specifically, it is the RECOMMENDATION of the Magistrate Judge that summary judgment be DENIED as to plaintiff's Eighth Amendment excessive force claims as to GRUVER; summary judgment be GRANTED as to plaintiff's Eighth Amendment excessive force claims and deliberate indifference claims as to GRATZ and SEYMOUR. To the

extent plaintiff asserted deliberate indifference claims against defendant GRUVER, he is entitled

to qualified immunity on those claims. It is the RECOMMENDATION of the Magistrate Judge

that defendants GRATZ and SEYMOUR be dismissed from this lawsuit, as they are entitled to

immunity on all claims asserted against them.

## VI.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Findings, Conclusions

and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED on June 20, 2018.

_____
LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

### *NOTICE OF RIGHT TO OBJECT*

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

Civil\215-314-Woolverton/David-MSJ:1