IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| CHRISTOPHER THOMAS WOOLVERTON in his Individual Capacity and as Personal Representative of the Estate OF CHRISTOPHER DOUGLAS WOOLVERTON,<br><br>    Plaintiff,<br><br>v.<br><br>BRAD LIVINGSTON, *et al.*,<br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br><br>2:15-CV-314 |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION TO GRANT
DEFENDANT GREGORY DAVID'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant DAVID's Motion for Summary Judgment on the Defense of Qualified Immunity (the "Motion"), with a supplemental brief in support and appendix of evidence. [ECF 230, 231, 232, respectively].[1] Plaintiff CHRISTOPHER THOMAS WOOLVERTON (proceeding on his own behalf and on behalf of his father's estate) filed a Response to the Motion, along with a Brief in Opposition to the Motion and an appendix of evidence. [ECF 241, 242, 243, respectively]. Defendant DAVID filed a Reply to the plaintiff's Response. [ECF 249][2]. This Court has reviewed all of the summary judgment evidence identified

---

[1] In addition to defendant DAVID, defendants MARTIN and BEACH joined in filing the original Motion for Summary Judgment. [ECF 230]. In his Response to the Motion, plaintiff did not oppose the Motion as to defendants MARTIN and BEACH [ECF 241 at 1], and the District Court entered an Order Granting Unopposed Motion for Summary Judgment as to those two defendants. [ECF 256].

[2] Defendant DAVID also filed a Motion to Strike Evidence as part of his reply to plaintiff's Response to the motion. [ECF 249]. The District Court entered an Order Granting in Part and Denying in Part the Motion to Strike Evidence. [ECF 258]. The Court has taken into account the Order in considering the inmate witness statements in issuing these Findings, Conclusions and Recommendation. To the extent that these witness statements contain evidence the District Court deemed inadmissible, this Court will not consider those statements in making a determination on qualified immunity. To the extent the witness statements are probative to the issue of qualified immunity and based on personal knowledge of the declarant, this Court has considered those statements, even if not directly mentioned in these Findings, Conclusions and Recommendation.

in this paragraph and all the arguments of the parties set forth in these documents.[3]

This case arises out of plaintiff's claims under 42 U.S.C. § 1983. Plaintiff makes claims of excessive force and deliberate indifference to serious medical needs in violation of the Eighth Amendment. These claims arise from the treatment of his deceased father, Texas Department of Criminal Justice ("TDCJ") inmate CHRISTOPHER DOUGLAS WOOLVERTON ("Woolverton") by defendant Gregory DAVID ("David"), an Assistant Warden at the TDCJ Clements Unit where Woolverton was housed during the relevant time period prior to his death.

I.
FACTUAL EVIDENCE BEFORE THE COURT

A. FACTUAL OVERVIEW

Woolverton was a TDCJ inmate housed at the Clements Unit beginning in May 2013 and continuing through his death while incarcerated on October 23, 2013. He was serving a sixty-to-life sentence and was classified as a Level 3 offender (regularly non-compliant with orders, highest risk of danger or self-harm) by prison staff. Woolverton was housed in the E-pod of the Administrative Segregation section of the Clements Unit during 2013. During the relevant time of the allegations contained in plaintiff's complaint, DAVID was an Assistant Warden assigned to oversee the inmates on the E-pod wing of the Administrative Segregation section of the Clements Unit while Woolverton was housed there. Defendant Michael Gruver ("Gruver") was a Major and DAVID was his supervisor.

Woolverton was transferred to the Clements Unit after serving some of his state-mandated sentence in a mental health unit. Prior to his transfer to Clements, Woolverton was diagnosed with stage IV or higher chronic kidney disease, asthma, and mental health disorders.

---

[3] The Court notes that additional remaining defendants BITTLE, KILLIAN, and SHOOK and defendants GRATZ, GRUVER, and SEYMOUR have filed independent Motions for Summary Judgment. [ECF 219, 227]. The Court has *not* considered either the evidence or arguments attached to these independent motions in issuing these Findings, Conclusions and Recommendation except to the extent it has been incorporated into DAVID's motion and the response and reply thereto.

He used a Foley catheter due to benign prostatic hyperplasia and suffered from frequent urinary tract infections. [ECF 77 at 5].

Debra Killian ("Killian") (also a defendant in this case, but not a party to this Motion), was a Licensed Vocational Nurse assigned to care for inmates at the Clements Unit, including Woolverton. On October 22, 2013, Killian notified defendant Andrew Gratz ("Gratz")(also a defendant in this case, but not a party to this Motion), a Sergeant assigned to oversee the inmates on the E-pod wing of the Administrative Segregation section of the Clements Unit while Woolverton was housed there, that Woolverton needed to be taken to "row 2," the medical department at the Clements Unit.[4] Woolverton did not come to the door of his cell on his own when given verbal commands to do so in order to go to the medical department. According to plaintiff's Amended Complaint, Paragraph 39, [ECF 77 at 10], Gratz obtained orders from Gruver to use a five-man extraction team and oleoresin capsicum ("OC") spray if necessary to transport Woolverton to his medical appointment. [ECF 240 at 155, ECF 243 at 6]. Gruver gave approval to use an extraction team and to use force as necessary, including the use of oleoresin capsicum ("OC") spray. [ECF 243 at 12].[5]

During the extraction from his cell, Woolverton was sprayed twice with OC spray and physically carried out of his cell and placed on a gurney for transport to the medical department. He was examined by a medical doctor on staff with TDCJ, Charles Bittle, Jr. (also a defendant,

---

[4] Prior to the incident on October 22, 2013, Woolverton was diagnosed with several documented medical conditions. However, with regard to this Motion, the Court will only consider Woolverton's medical conditions as they relate to the knowledge *this defendant* had of any of those conditions prior to and during the events of October 22, 2013. Specifically, plaintiff alleges in his Amended Complaint, DAVID had knowledge of Woolverton's asthma problems and his categorization as a "do not gas" prisoner prior to the use of force involving OC spray in extracting Woolverton from his cell. [ECF 77 at 6].

[5] In his Response [ECF 241 at 2], Plaintiff alternatively alleges DAVID authorized the use of chemical agents to extract Woolverton from his cell; however, in his amended complaint, paragraph 39, plaintiff clearly acknowledges Gratz stated to the video camera during the extraction that he obtained orders to use chemical agents from Gruver and that "reports" confirm Gruver approved the use of force. [ECF 77 at 10]. This claim will be discussed *infra*.

but not a party to this Motion). Woolverton was not decontaminated of the OC spray during his time at the medical department. After the examination, defendants transported Woolverton back to the E-pod, albeit to a different cell. The defendants left Woolverton, still covered in OC spray, on the floor of the new cell. At some point later, defendant DAVID returned and witnessed plaintiff lying naked on the floor in this new, empty cell. Early in the morning hours of October 23, 2013, Woolverton was found unresponsive in his cell. CPR and other revival efforts were performed, but an EMT pronounced Woolverton dead shortly before 2:00 a.m.

### B. CHRONOLOGY OF EVENTS RELEVANT TO DAVID ON OCTOBER 22 AND 23, 2013

1. *Defendant DAVID was informed that Woolverton needed to be taken to the medical department by use of force.*

On October 22, 2013, Defendant DAVID was giving a tour of the prison to two civilians when he entered the "pod" where Woolverton was housed. [ECF 232 at 4]. DAVID stated he witnessed a five-man extraction team being suited up in preparation for a use of force and that he asked either Gratz or defendant Matthew Seymour ("Seymour") (also a defendant in this case, but not a party to this Motion), why the team was being assembled. *Id*. DAVID stated he was informed the prison guards were under doctor's orders to get Woolverton to the medical department. *Id*. DAVID further said that once he was informed about the situation he then,

> …approached Woolverton's cell and saw him lying on the floor wearing boxers, a state issued jacket and boots. He had one leg crossed over the other, swaying his legs back and forth, apparently pretending to hold a cigarette; however, there was nothing in his hand. I asked Woolverton what he was doing, to which he responded by sticking up his middle finger at me. I observed that these actions were not inconsistent with my previous interactions with Woolverton.

*Id*. DAVID elaborated that on prior occasions he had authorized uses of force against Woolverton when he refused to obey orders and was assaultive towards both inmates and prison staff. *Id*. at 5. DAVID stated he thought that on October 22 plaintiff's actions were consistent

with his prior knowledge of plaintiff's "difficult personality" and that he was simply refusing to obey orders because he did not want to go to the medical department. *Id*. DAVID said he did not perceive plaintiff's health to be in imminent danger. *Id*. Defendant David said he then continued his tour, left the area and was not present during the use of force. *Id.* at 4.

One inmate stated DAVID, the Major[6] and another person in street clothes, along with Gratz, came to Woolverton's cell, and while there, Gratz asked DAVID what he wanted to do about the situation. [Cooper Statement, ECF 240 at 76]. The inmate stated he did not hear DAVID's response and "they left the cell." *Id*. Another inmate stated although he could

> vaguely see what was going on [I] guess Warden Davids (sic) okay-d a cell search because I seen (sic) him nod his head to Sgt. Grattz (sic). Now, I'm only making that assumption because I couldn't hear the conversation, only going off body language. Now, Warden Davids (sic), Major Gruver, and the other 2 fellows leave.

[Hardeman Statement, ECF 240 at 79]. Another inmate stated the Warden, the Major and two others came on the wing, looked in on Woolverton, looked around the wing and left. [Palomo Statement, ECF 240 at 87].

A fourth inmate stated, "The nurse and others left and the Warden and several other people in street clothes came in, looked in at Wolverton (sic), laughed and left." [Rashid Statement, ECF 240 at 90]. Another inmate stated, "Right after this [Gratz approaching Woolverton's cell] both the head and assistant wardens and a major and someone else, a man in civilian clothes, came into E-wing. They looked in Woolverton's cell and left without any concern…" [Ventura Statement, ECF 240 at 94]. A different inmate stated he witnessed Warden Beach come to the pod and make fun of the situation and ultimately give the "nod" to force

---

[6] The Court construes references in the inmate witness statements as to "the Major" to indicate Gruver, and those as to "the Warden" to indicate DAVID.

Woolverton out of the cell. [Jackson Statement, ECF 240 at 84].[7] Another inmate said Warden Beach along with Major Gruver and two officials from Huntsville headquarters were present before and during the use of force and laughed about Woolverton lying naked in the fetal position in his cell (presumably before the extraction). [Miller Statement, ECF 240 at 99]. However, Gruver testified that Gratz notified him of the situation, including Woolverton's refusal of restraint and strip search procedures, and that he ultimately authorized the use of force including chemical agents. [ECF 243 at 12; 249-1 at 5].

DAVID was not on the pod when the actual extraction and use of force with chemical agents occurred. While he was aware Woolverton was to be taken to the medical clinic pursuant to doctor's orders, DAVID stated he did not know the reason for the medical visit, was not made aware of Woolverton's medical condition, and was not aware whether he was on a "do not gas" list. [ECF 232 at 5].

   2. *Woolverton was taken back to E-pod, placed in a new cell and DAVID observed Woolverton in the new cell.*

After his visit to the medical clinic, Woolverton was returned to a new, clean cell in the E-pod and placed on the floor. [ECF 232 at 18]. Woolverton was found unconscious in his cell after 1:00 a.m. on October 23, 2013, approximately eleven (11) to twelve (12) hours later, and pronounced dead shortly thereafter. Although inmate witnesses stated various officers approached Woolverton's cell to taunt him or laugh at him after his return from the medical department [ECF 240 at 70-102], it is unclear from the record whether anyone was actually following up and checking on Woolverton following the use of force.

---

[7] Plaintiff asserts that inmate Jackson was mistaken when he used the name Warden Beach and that it was DAVID who the inmate actually witnessed and referenced in his statement. [ECF 242 at 5, fn.2]. As stated in the previous footnote, the Court, in construing the evidence in the light most favorable to plaintiff, is considering the references to "Warden" all refer to DAVID, particularly in light of evidence that Warden Beach was not on duty on October 22, 2013. [ECF 249-1 at 6].

Plaintiff argues DAVID visited Woolverton in his new cell and condoned leaving him naked on the cold floor in the empty cell. Plaintiff cites to several witness statements alleging DAVID was at the new cell making improper, derogatory comments and laughing at Woolverton. The Court has reviewed these statements and, as with the statements discussing DAVID's role in the use of force, assumes DAVID allegedly visited Woolverton in his new cell and made derogatory comments and laughed. [Unknown Inmate Statement, ECF 240 at 71; Johnson Statement, *Id*. at 73; Jackson Statement, *Id*. at 85; Rashid Statement, *Id*. at 90; Ventura Statement, *Id*. at 96]. Some of the inmate statements are unclear as to exactly which Clements Unit officers visited Woolverton in his new cell. Nevertheless, because the Court must construe the evidence in the light most favorable to plaintiff, the Court will assume the inmates were referring to Assistant Warden DAVID.

## II.
## PLAINTIFF'S CLAIMS FOR RELIEF AGAINST DAVID

Plaintiff makes the following claims as to DAVID in his Amended Complaint:

1. Cruel and Unusual Punishment Through Excessive Use of Force under the Eighth Amendment[8] by:

    Authorizing, as a supervisor at TDCJ, the use of OC spray on October 22, 2013 to extract Woolverton from his cell when he had serious medical needs, was on the "do not gas" list, and was "almost completely unresponsive" during the extraction process.

2. Cruel and Unusual Punishment Under the Eighth Amendment for Deliberate Indifference to Woolverton's serious medical needs by:

    a. Standing outside Woolverton's cell prior to the use of force, talking about him.

    b. Authorizing the use of OC spray on October 22, 2013 to extract Woolverton

---

[8] In the Amended Complaint, plaintiff does not assert a claim for relief under the Fourth Amendment for excessive use of force against Woolverton.

      from his cell when he had serious medical needs, was on the "do not gas" list, and was "almost completely unresponsive" during the extraction process.

   c. Leaving Woolverton on the cold cell floor for almost ten (10) hours with no follow-up after he was sprayed with OC spray, with no clothing, towels or mattress on a cold night and making disparaging remarks while outside the cell.

## III.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A qualified immunity defense, however, alters the usual summary judgment burden of proof, such that governmental employees need only assert the defense in good faith, putting forth no evidence, to shift the burden to the non-movant to show the defense does not apply. *Davalos v. Johns*, 2013 WL 1820313, at *3-4 (N.D. Tex. Apr. 30, 2013)(citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). The non-movant must demonstrate how specific evidence in the record, and all reasonable inferences therefrom, viewed by the court in a light most favorable to the non-movant, presents a genuine, material fact dispute for trial regarding all essential elements of the claim(s). *Id.* at 4. "Conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment." *Id.* Plaintiff's failure to produce proof as to *any* essential element of the claim renders all other facts regarding that claim immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007). Summary judgment is mandatory as to the claim in question if plaintiff fails to

meet this burden. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994)(en banc)(per curiam).

Qualified immunity is a defense that protects government officials from suit when they exercise the discretionary functions of their office. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). In order to overcome a defense of qualified immunity, a plaintiff must establish that: "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established at the time of the challenged conduct,'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (citing *Ashcroft v. al-Kidd*, l31 S.Ct. 2074, 2080 (2011)). Plaintiff must demonstrate that the defendant's conduct was objectively unreasonable in light of the legal rules clearly established at the time of her actions. *Thomas v. City of Dallas*, 175 F.3d 358 (5th Cir. 1999). Conclusory allegations of wrongdoing will not satisfy these requirements. *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988). The court may examine these factors in any order. *Pearson v. Callahan*, 555 U.S. 223 (2009) *overruling in part Saucier v. Katz*, 553 U.S. 194 (2001). It is a plaintiff's burden to present evidence that a defendant is not entitled to qualified immunity when the defense is raised. *See Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001).

Claims of qualified immunity are not judged on twenty-twenty hindsight, or in light of knowledge ascertained after an event, but by looking through the eyes of the public official, considering what that official knew about the situation at the relevant time. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Poole v. City of Shreveport*, 691F.3d 624,630 (5th Cir. 20l2). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 34l (1986). "Pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the

conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *See Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) (emphasis in original omitted). If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact. *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## IV.
## THE LAW ON EXCESSIVE FORCE AND DELIBERATE INDIFFERENCE UNDER THE EIGHTH AMENDMENT

### A. EXCESSIVE FORCE

In addressing an excessive force claim brought under section 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. *Baker v. McCollan*, 443 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged"). In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The validity of the claim must then be judged by reference to the specific constitutional standard that governs that right, rather than to some generalized "excessive force" standard. *Id.* (*cf. Tennessee v. Garner*, 471 U.S. 1 (1985) (claim of excessive force to effect arrest analyzed under a Fourth Amendment standard); *Whitley v. Albers*, 475 U.S. 312 (1986) (claim of excessive force to subdue convicted prisoner analyzed under an Eighth Amendment standard)).

In this instance, plaintiff alleges a violation under the Eighth Amendment for excessive force. The plaintiff does not appear to allege a violation of Woolverton's rights based on his

physical removal from the cell to be taken to the medical department. Instead, plaintiff objects to the manner of force used to extract Woolverton from the cell, specifically DAVID's alleged authorization of the use of chemical agents; accordingly, such claim appears properly addressed under the Eighth Amendment standards on excessive force.

It is clearly established law that prison staff cannot act with deliberate indifference to a prisoner's "serious illness or injury." *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should also be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged. *Whitley*, 475 U.S. at 320. The deliberate indifference standard articulated in *Estelle* was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not *ordinarily* clash with other equally important governmental responsibilities. *Id*. However, the *Whitley* court recognized that sometimes responding to the medical needs of inmates can clash with "the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)). Woolverton's case presents a situation where prison guards were tasked with transporting an inmate with a history of sometimes violent non-compliance, who was housed in the administrative segregation section of the unit, to the medical department.

The "core judicial inquiry" into a plaintiff's claim of excessive force under the Eighth Amendment is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Martin v. Seal*, 510 F. App'x 309, 312 (5th Cir. 2013) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). The inquiry has two components:

(1) an objective one that focuses on whether the alleged wrongdoing was nontrivial and harmful enough to violate the constitution and (2) a subjective one that focuses on the mental state of the alleged wrongdoer. *Hudson*, 503 U.S. at 7-8.

In the instant case, although argued otherwise by plaintiff, the evidence supports a finding that DAVID did not authorize the use of force or the use of chemical agents to extract Woolverton from his cell; therefore, a further analysis under *Hudson*[9] of the five factors used to answer that inquiry is not necessary. DAVID stated that while giving a tour to two civilians he witnessed the extraction team, inquired about its purpose, and was told Woolverton was under doctor's orders to report to medical but was uncooperative. [ECF 232 at 4]. DAVID said he approached the cell and witnessed Woolverton "stick up his middle finger at me," whereupon DAVID left the area with his tour. *Id*. Gratz testified it was DAVID who told him to contact Gruver for authorization to use an extraction team. Specifically, Gratz testified that upon being told of the situation at hand, DAVID stated, "[U]se full precaution, use a team, contact Major Gruver, get authorization through him." [ECF 243 at 6]. Gratz reported the situation to Major Gruver, the highest-ranking shift supervisor on duty,[10] and informed him that Woolverton refused restraint and strip search procedures, requiring other means of transport to the clinic. [ECF 249-1 at 5]. Major Gruver testified <u>he</u> authorized the use of chemical agents. [ECF 243 at 12]. DAVID was not on the pod when the actual extraction and use of force with chemical agents occurred. While he was aware Woolverton was to be taken to the medical clinic pursuant to doctor's orders, DAVID stated he did not know the reason for the medical visit, was not made

---

[9] The courts look to five nonexclusive factors to make the two-step, objective/subjective determination: "1. the extent of the injury suffered; 2. the need for the application of force; 3. the relationship between this need and the amount of force used; 4. the threat reasonably perceived by the responsible officials; and 5. any efforts made to temper the severity of a forceful response." *Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998) (citing *Hudson*, 503 U.S. at 7).

[10] According to the TDCJ Use of Force Plan, III. (F)(1)(a)(3), the highest-ranking shift supervisor on duty shall decide if a chemical agent shall be used to gain compliance. [ECF 232 at 11].

aware of Woolverton's medical condition, and was not aware whether he was on a "do not gas" list. [ECF 232 at 5].

To the extent inmate witnesses stated they saw DAVID "nod" to Gratz thereby authorizing the use of force and the use of chemical agents, the Court finds this evidence fails to raise a fact issue. Although inmate Hardeman stated he saw DAVID "nod" to Gratz, Hardeman admitted he was making an assumption that DAVID's non-verbal action was meant to okay "a cell search" based on body language. [ECF 240 at 82]. This statement is nothing more than speculation asserted by an inmate who "could vaguely see what was going on" and who "couldn't hear the conversation." *Id*. Likewise, inmate Jackson's statement that the warden "ultimately gave the knod (sic) to have Mr. Woolverton forced to come out of the cell" [ECF 240 at 87] is conclusory and speculative in that it does not state what question or statement the supposed non-verbal signal was in response to. No statement by inmates Rashid, Ventura or Miller indicate DAVID authorized the use of force. *Id*. at 92-95, 96-99, 102-105.

Finally, plaintiff's argument, in his response to DAVID's motion for summary judgment, centers partially around the supposition that it was DAVID who authorized the use of force, including chemical agents. The evidence and witness statements provide that it was Major Gruver who authorized the use of force with chemical agents. In fact, plaintiff's First Amended Complaint states, "Sgt. Gratz stated to the camera that he had obtained orders from Major Gruver to use chemical agents. Reports confirm that Major Gruver approved the use of force." [ECF 77 at 10]. Plaintiff is bound by his pleading. The factual assertion in the pleading that Gruver authorized the use of force with chemical agents constitutes a judicial admission such that

DAVID's alleged role in the use of force is a fact that is "no longer at issue." *See Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987)(citation omitted).[11]

There is insufficient evidence in the record, even viewing the evidence in a light most favorable to plaintiff, to sustain a finding that DAVID authorized the use of chemical agent on Woolverton; thus, DAVID's motion for summary judgment as to excessive force should be granted.

B. DELIBERATE INDIFFERENCE

Inmate witness statements show "the warden and the major and some other people" visited Woolverton in his new cell and made negative comments. [Unknown Inmate Statement, ECF 240 at 71]. Those statements are as follows:

> "I observed the wardens, major and others go to the cell and laugh at him in distress" [Rashid Grievance, ECF 240 at 73];
>
> "The Warden Beach came in E-Wing went to his cell and made derogatory statements to him, and us [as] a whole such as 'anybody else want some?!'" [Jackson Statement, ECF 240 at 82];
>
> "Several guards came into the unit went to [Woolverton's] cell and made jokes about his lying nude on the floor" [Palomo Statement, ECF 240 at 84]; and
>
> "I don't know who the officers were, but a few of them walked in on E-wing and went to E-122 cell. What they did there I couldn't see because I lived on 205, second tier." [Ventura Statement, ECF 240 at 93].

The Court will assume *arguendo* and for purposes of this analysis, that DAVID is the warden referenced in these statements who visited Woolverton at his new cell and either laughed at him, made jokes to other officers, or made derogatory comments.

Deliberate indifference "is an extremely high standard to meet." *Hernandez v. Tex. Dep't*

---

[11] Additionally, the Court declines to reach the possible issue of supervisory liability as it relates to DAVID. Plaintiff's Amended Complaint is unclear as to whether it raises this claim. Nevertheless, liability based upon a theory of respondeat superior is not appropriate in a claim for section 1983 relief. *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)*; Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978); *Evett v. DETNTFF,* 330 F.3d 681, 689 (5th Cir. 2003); *Alton v. Texas A&M Univ.,* 168 F.3d 196, 201 (5th Cir. 1999); *Thompkins v. Belt,* 828 F.2d 298, 303–04 (5th Cir. 1987).

*of Protective & Regulatory Servs.*, 380 F.3d 872, 882 (5th Cir. 2004). ("We begin by emphasizing that our court has interpreted the test of deliberate indifference as a significantly high burden for plaintiffs to overcome."). A prison official acts with deliberate indifference "only if (A) he knows that inmates face a substantial risk of serious bodily harm and (B) he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)); *see also Reeves v. Collins*, 27 F.3d 174, 176–77 (5th Cir. 1994).

A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). The Fifth Circuit has defined a "serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that *even a layman* would recognize that care is required." *Gobert*, 463 F.3d at 345, n.12 (emphasis added).

Verbal abuse and threatening language do not give rise to a section 1983 claim. *See White v. Gutierez*, 274 Fed. Appx. 349 (5th Cir. 2008) (citing *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997)(verbal abuse by a prison guard does not give rise to a cause of action under section 1983)). Plaintiff argues, however, that DAVID's taunts and comments after the use of chemical agents, taken in conjunction with the events leading up to Woolverton's death, and delivered in a manner calculated to be heard by everyone on the cell block, including the TDCJ officer assigned to the cell block, demonstrated an approval of the infliction of additional pain and suffering. Moreover, argues plaintiff, DAVID's observations of Woolverton in his new cell

alerted DAVID to the need for medical care that he failed to order and his callous comments indicate he failed to do so with deliberate indifference to plaintiff's serious medical needs.

Plaintiff argues the current case is akin to *Fielder v. Brossard*, in which an inmate died after being denied medication, being denied multiple requests for medical care and being beaten by the jailor. 590 F.2d 105, 108 (5th Cir. 1979). Although the Fifth Circuit considered the jailor's comments in conjunction with the events leading up to the prisoner's death when adducing whether jailors were merely negligent, that court clearly reiterated that comments themselves do not establish cruel and unusual punishment. *Id*. at 107. As articulated by defendant, at no time did DAVID refuse Woolverton food, medication, or medical care; there is no evidence Woolverton repeatedly begged for help and was refused, and there is no evidence DAVID beat Woolverton. Again, assuming *arguendo* that DAVID visited Woolverton in the new cell and either laughed at him, made jokes to other officers, or made derogatory comments, there is no evidence that DAVID had knowledge of Woolverton's serious medical needs and ignored those needs after he was returned from his medical department visit. The instant case cannot be likened to *Fielder*.

To the extent that plaintiff argues DAVID's actions in returning to the cell or making comments constitutes deliberate indifference, plaintiff has failed to raise of fact question regarding DAVID's knowledge of plaintiff's continuing medical need. DAVID was not present to observe what level of care was provided to Woolverton by the medical department during the examination or upon his return to the cell. Nor has plaintiff pointed to any evidence in the record that DAVID obtained knowledge after Woolverton's medical exam and return to E-pod as to the need for any follow-up care.

The effects of OC spray are described in the record as "instant" and include "acute

burning and closing of the eyes, along with inflammation of mucous membranes and upper respiratory system." [ECF 240 at 198]. Plaintiff has not raised a fact question that DAVID had knowledge that lack of decontamination of OC spray *after examination by medical staff following its use* might be problematic for Woolverton. Although plaintiff's experts acknowledge that medically trained personnel would realize this could constitute a serious risk, DAVID was not medically trained. DAVID was not made aware of any orders by the medical department to provide follow-up care to Woolverton. Plaintiff has not articulated specific facts in the record, in the face of DAVID's assertion of qualified immunity and denial of any actual knowledge of Woolverton's medical needs, to show that DAVID knew of the substantial risk of serious harm to Woolverton by failing to provide any additional care. Plaintiff has not stated an Eighth Amendment claim for deliberate indifference against DAVID, and his motion for summary judgment in this regard should be granted.

## V.
## RECOMMENDATION

For the above reasons, it is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that defendant DAVID's Motion for Summary Judgment [ECF 230] be granted and a final judgment entered in his favor.

## VI.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of these Findings, Conclusions and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED June 20, 2018.

_____
LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).