IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CHRISTOPHER THOMAS WOOLVERTON in his Individual Capacity and as Personal Representative of the Estate OF CHRISTOPHER DOUGLAS WOOLVERTON | § § § § § § | |
| Plaintiff, | § § | 2:15-CV-314 |
| v. | § § | |
| BRAD LIVINGSTON, *et al*., | § § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS BITTLE, KILLIAN AND SHOOK'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants BITTLE, KILLIAN, and SHOOK's joint Motion for Summary Judgment. [ECF 219] ("Joint Motion"). Plaintiff CHRISTOPHER THOMAS WOOLVERTON (proceeding on his own behalf and on behalf of his father's estate) filed a Response to the Joint Motion, along with a Brief in Opposition to the Joint Motion and an appendix of evidence. [ECF 235, 236, 237, respectively]. In plaintiff's Response, it was agreed that defendant SHOOK, and all claims against him, should be dismissed from this lawsuit. [ECF 235 at 1]. Remaining defendants BITTLE and KITTLE filed a Reply to the Response. [ECF 245]. This Court has reviewed all of the summary judgment evidence identified in this paragraph and all the arguments of the parties set forth in these documents.[1]

---

[1] The Court notes that additional remaining defendants GRUVER, GRATZ, and SEYMOUR have filed an independent Motion for Summary Judgment. [ECF 227]. Remaining defendant DAVID has filed a Motion for Summary Judgment as well. [ECF 230]. The Court has not considered either the evidence or arguments attached to these independent motions in issuing these Findings, Conclusions and Recommendation with regard to BITTLE, KILLIAN, and SHOOK's Joint Motion. Plaintiff has not incorporated by reference any of the evidence attached to the replies to these other motions to his reply to this Joint Motion.

This case arises out of plaintiff's claims under 42 U.S.C. § 1983. Plaintiff makes claims of excessive force and deliberate indifference to serious medical needs in violation of the Eighth Amendment. These claims arise from the treatment of his deceased father, Texas Department of Criminal Justice ("TDCJ") inmate CHRISTOPHER DOUGLAS WOOLVERTON ("Woolverton") by the defendants, Dr. Charles BITTLE ("BITTLE") and Licensed Vocational Nurse Debra KILLIAN ("KILLIAN"), both of whom were medical staff working at the TDCJ Clements Unit where Woolverton was housed during the relevant time period prior to his death.

I.
THE FACTUAL EVIDENCE BEFORE THE COURT

A.  FACTUAL OVERVIEW

Woolverton was a TDCJ inmate housed at the Clements Unit beginning prior to 2013 and continuing through his death while incarcerated on October 23, 2013. He was serving a sixty-to-life sentence and was classified as a Level 3 offender (regularly non-compliant with orders, highest risk of danger or self-harm) by prison staff. Woolverton was housed in the E-pod of the Administrative Segregation section of the Clements Unit during 2013. During the relevant time of the allegations contained in plaintiff's complaint, defendant BITTLE was a medical doctor who treated TDCJ patients on-site at the unit and defendant KILLIAN was a Licensed Vocational Nurse ("LVN") who performed "rounds" at the unit. Both defendants were assigned to oversee the inmates on the E-pod wing of the Administrative Segregation section of the Clements Unit while Woolverton was housed there. Shook was a Registered Nurse ("RN") who also performed "rounds" for inmate patients at the unit.

Woolverton was transferred to the Clements Unit after serving some of his state-mandated sentence in a mental health unit. Prior to his transfer to Clements, Woolverton was diagnosed with stage IV or higher chronic kidney disease, asthma, and mental health disorders.

He used a foley catheter due to benign prostatic hyperplasia and suffered from frequent urinary tract infections.

These conditions are documented by the medical records. It also appears from the medical records that not only did Woolverton's kidney ailment constitute a progressive and degenerative disorder, but also that his condition was worsening over time. As part of his prescribed treatment for kidney disease, Woolverton had to use a catheter to void his bladder on most occasions.

On October 22, 2013, KILLIAN notified Sergeant Andrew Gratz[2] that Woolverton needed to be taken to "row 2," the medical department at the Clements Unit. Woolverton did not come to the door of his cell on his own when given verbal commands to do so in order to go to the medical department. Gratz sought approval from Major Michael Gruver to use a five-man extraction team and oleoresin capsicum ("OC") spray if necessary to transport Woolverton to his medical appointment. Gruver gave approval to use an extraction team and to use force as necessary, including the use of OC spray. KILLIAN was present during the use of force, as was Lieutenant Matthew Seymour. Gruver, Gratz, and Seymour were all TDCJ officers assigned to security staff that oversaw the Clements Unit, including the E-pod where Woolverton was housed.

During the extraction from his cell, Woolverton was sprayed twice with OC spray then physically carried out of his cell and handcuffed to a gurney. KILLIAN was present during the extraction, but BITTLE was not. BITTLE first saw Woolverton during the medical examination after the extraction. During the examination by BITTLE, Gratz placed a mask over Woolverton's

---

[2] Gratz, Seymour, and Gruver are co-defendants in this case, but are not parties to this Joint Motion. The Court has separately considered their actions or inactions by addressing their own Joint Motion for Summary Judgment.

nose and mouth. Woolverton was not catheterized to release urine during the medical examination and was not given any medications at that time. No fluids were given to Woolverton during the examination. Woolverton was not decontaminated of the OC spray during his time at the medical department or after he was returned to his cell. After the examination, Woolverton was transported back to the E-pod, albeit to a different cell, and left, still covered in OC spray, on the floor of the new cell. Early in the morning hours of October 23, 2013, Woolverton was found unresponsive in his cell. CPR and other revival efforts were performed, but an EMT pronounced Woolverton dead shortly before 2:00 a.m.

B. CHRONOLOGY OF EVENTS RELEVANT TO KILLIAN AND BITTLE FROM OCTOBER 20-23, 2013[3] AND WOOLVERTON'S PAST RELEVANT MEDICAL HISTORY

BITTLE first treated Woolverton at the Clements Unit on July 30, 2013, approximately two months after Woolverton first arrived at the unit. [ECF 237 at 2-3, 12]. BITTLE continued to provide treatment, although not exclusively as the only doctor or medical personnel, until Woolverton's death. [ECF 237 at 1-73]. BITTLE testified that he had access to, and reviewed, a patient's previous medical history and mental health treatment before an initial visit and prior to beginning a care plan. [ECF 237 at 76-77, 81-83]. BITTLE also testified that he had specific knowledge of Woolverton's following mental health conditions: major depressive disorder, with recurrent, severe psychotic features, anxiety disorder, and posttraumatic stress disorder with antisocial tendencies. [ECF 237 at 107]. BITTLE testified that weight loss of more than one pound a week was abnormal and would give him cause for concern. [ECF 237 at 85, 133-134].

---

[3] Plaintiff alleges claims under the Eighth Amendment for deliberate indifference by these defendants ranging from August of 2103 through October 23, 2013. However, plaintiff did not file his initial complaint until October 20, 2015 [ECF 1]. Defendants have objected to the timeliness of claims from any events prior to October 20, 2013. The Court will consider medical records and evidence from before October 20, 2013 for determining what *knowledge* KILLIAN and BITTLE had of Woolverton's medical issues and as evidence of their intent for later alleged acts or omissions, as such evidence is relevant to a determination of qualified immunity. However, the Court will not consider whether KILLIAN and BITTLE acted with deliberate indifference prior to October 20, 2013. These claims are outside the statute of limitations.

BITTLE testified he relied on nurses' assessments in making medical decisions, until he is actually able to observe a patient himself. [ECF 237 at 157].

BITTLE was also aware of Woolverton's physical ailments, as demonstrated by his physician notes in the medical records, as follows: chronic kidney disease, problems with self-catheterization, neurogenic bladder that is complicated by mental health issues, multiple bladder infections, Foley catheter history, seizure disorder and asthma. [ECF 237 at 13]. On August 5, 2013, BITTLE noted that Woolverton, in addition to his past medical history, also had dementia associated with chronic kidney disease, and that Woolverton was on the "do not gas" list. [ECF 237 at 17-19]. BITTLE also was aware of Woolverton's weight loss and his need for a hyper-caloric diet. [ECF 237 at 17]. These records also indicate that Woolverton claimed to be Hepatitis B and C positive and had a history of manipulative behaviors and incidents with staff regarding care, including throwing water on security when he was displeased with the size of catheter he was provided. [ECF 237 at 19]. Woolverton needed an asthma inhaler to manage chronic and acute symptoms of asthma. [ECF 237 at 4-9]. Woolverton's medical records indicate he complained that chemical agents used on his cellblock aggravated his asthma. [ECF 237 at 39-43].

It is apparent from the medical records that Woolverton's neurogenic bladder issues and kidney disease were worsening rapidly during the month of October 2013, the final month of his life. [ECF 237 at 43-73]. Woolverton had repeated issues with self-catheterization and with infections during this time, as well as episodes of self-harm and mental deterioration. *Id*.

KILLIAN also interacted with Woolverton prior to October 22, 2013. The medical records indicate that KILLIAN saw Woolverton on October 14, 2013 in response to a sick call request by Woolverton. [ECF 237 at 56-57]. KILLIAN testified that, prior to that time, she had

knowledge that Woolverton had a neurogenic bladder and had to self-catheterize. [ECF 237 at 192]. She was aware he suffered from chronic kidney disease, and on October 14, 2013 Woolverton told KILLIAN he was only able to get a small amount of urine to release when he self-catheterized. [ECF 237 at 192-193]. KILLIAN testified that after this visit, she scheduled Woolverton to see BITTLE because of concerns for his health. *Id*. KILLIAN testified that on October 22, 2013 she also knew that Woolverton was losing weight rapidly and had incontinence issues. [ECF 237 at 203-205, 210]. KILLIAN testified she wanted him to be seen by a doctor on October 22, 2013 because of her knowledge of his medical issues and the kidney pain he was having on that day. [ECF 237 at 206]. KILLIAN testified she "didn't care how he was seen. He needed to be seen" and "he was going [to medical] one way or another." *Id*.

Prior to the use of force involving chemical agents on October 22, 2013, KILLIAN summoned Gratz to Woolverton's cell. [ECF 237 at 240]. Gratz and Seymour both testified that KILLIAN told them Woolverton had to go to the medical unit by doctor's orders. [ECF 237 at 240, 256]. KILLIAN testified numerous times that she knew Woolverton was very ill, which is why she insisted he be taken to the medical department; she knew that if Woolverton's kidneys were to fail, he could die very quickly. [ECF 237 at 180-181, 187-189, 193, 214-15, 231].

KILLIAN knew that Woolverton had been referred to her by the mental health team on October 22, 2013, and she knew his mental health conditions before she went to his cell that day. [ECF 237 at 185]. KILLIAN also testified she knew Woolverton was refusing his catheters and refusing to change them regularly. [ECF 237 at 194]. KILLIAN reviewed Woolverton's chart before going to his cell and knew he had asthma on October 22, 2013. [ECF 237 at 196]. KILLIAN testified she was aware of a "do not gas" designation made for every asthmatic, but believed inmates on the list could still be gassed if medical was present. [ECF 237 at 197-98].

BITTLE testified his understanding of the TDCJ Use of Force Plan (the "Plan") is that the nurse is responsible to inform security officers that a "do not gas" designation exists, and to advise against using OC spray in those situations or to approve of use if the medical situation permits it. [ECF 237 at 127, 158-59].

KILLIAN was present during the entire use of force on October 22, 2013. [video 1 at 0:00-26:00, part 2, 0:00-6:00]. KILLIAN admitted that she never told any security personnel (Gruver, Gratz or Seymour) about the "do not gas" designation in Woolverton's chart or about his asthma. [ECF 237 at 229]. Gratz, Seymour and Gruver testified that KILLIAN never told them about the "do not gas" list, the asthma, or any of his medical or mental conditions. [ECF 237 at 239, 243, 250, 257-58, 275-76, 299]. On the use of force video, KILLIAN is not heard expressing any concerns over the force used or conversing with the security officers to determine whether Woolverton was capable of following the verbal orders given before chemical agents were deployed the first time [video 1 at 0:00-3:27] or the second time [video 1 at 3:35-7:30]. Neither KILLIAN or BITTLE objected when Gratz placed a mask over Woolverton's face during the medical examination, nor did either order it removed. [video 1 at 24:25].

Once Woolverton was extracted from his cell, he was taken to the medical department where BITTLE examined him. BITTLE testified that in these forcible extraction situations, his initial examination is "cursory." [ECF 237 at 148]. The video shows that BITTLE's examination of Woolverton lasts a little over three minutes. [video 1 at 23:32-26:05, part 2, 0:00-1:15]. BITTLE performed some diagnostic testing on a feces sample obtained from soiled garments, and questioned Woolverton about kidney pain, listened to his lungs and checked the pulse in his feet. [ECF 237 at 73, 145-146]. BITTLE did not order Woolverton to be decontaminated or assist him with decontamination prior to clearing him to be returned to his cell. KILLIAN did not order

Woolverton to be decontaminated or assist him with decontamination at any time. KILLIAN testified, "we [medical staff] don't assist" in decontamination, only security personnel could assist. [ECF 237 at 218].

KILLIAN testified that she and BITTLE returned to Woolverton's cell after the video was stopped because she was worried about Woolverton. [ECF 237 at 208-10]. There are no records that KILLIAN or BITTLE ordered any additional supervision of Woolverton after that time, or that other medical personnel followed up with Woolverton later that day.

The medical records in general indicate that Woolverton was seen by medical personnel on a regular basis upon his arrival at the Clements Unit until the time of his death. There is a scarcity of medical records submitted as summary judgment evidence between 3:03 a.m. on the morning of October 19, where medical records indicate Woolverton had not self-catheterized in two days, until 9:00 a.m. the morning of October 22, when a nurse observed Woolverton to be "scarcely moving" and "unresponsive" in his cell. [ECF 221 at 19-67, ECF 237 at 1-73]. The sole piece of medical evidence during this period is a single page document, where RN Shook attempted to deliver new catheter supplies to Woolverton in the early hours of October 21, but the supplies were apparently "refused" or Woolverton did not respond. *Id*.

## II.
## PLAINTIFF'S CLAIMS FOR RELIEF AGAINST KILLIAN AND BITTLE[4]

Plaintiff makes the following claims in his Amended Complaint:

1.    Cruel and Unusual Punishment Under the Eighth Amendment for Deliberate Indifference to Woolverton's serious medical needs by:

---

[4] The Court only lists here the alleged actions or omissions by KILLIAN and BITTLE on October 20-23, 2013. These are the claims that are **not** barred by the statute of limitations, as discussed in footnote three.

a. Failing to provide adequate care for the treatment of Woolverton's degenerative kidney disease after being aware of the substantial risk of harm in failing to do so.

b. Failing to monitor Woolverton's catheterization habits for his degenerative kidney disease after being aware of the substantial risk of harm in failing to do so.

c. Failing to monitor Woolverton's rapid weight loss and the implications of his failure to eat several meals after placing Woolverton on a high calorie diet and after being aware of the substantial risk of harm in failing to do so.

d. KILLIAN's failure to decontaminate Woolverton after the use of OC spray (also listed under excessive force claim).

e. KILLIAN and BITTLE's failure to decontaminate Woolverton during the medical examination or tell TDCJ security officers that Woolverton was an asthmatic who required decontamination or observation following use of OC spray.[5]

f. KILLIAN's failure to report Woolverton's complaints about breathing problems following his return to his cell after the medical examination.

g. KILLIAN's failure to provide follow-up care or check on Woolverton after leaving Woolverton in the cell upon return from the medical examination.

2. Cruel and Unusual Punishment Through Excessive Use of Force under the Eighth Amendment[6] by (only asserted against KILLIAN):

a. KILLIAN's failure to inform Gruver, Gratz and Seymour that using OC spray on October 22, 2013 to extract Woolverton from his cell was contraindicated because he had serious medical needs (asthma), was on the "do not gas" list, and his lack of compliance could result from his altered mental state as a

---

[5] Plaintiff also discusses in his responsive brief, although not in his Amended Complaint, that Gratz harmed Woolverton by placing a mask over Woolverton's mouth during the medical exam. Plaintiff alleges KILLIAN and BITTLE did not object to placing this mask over his mouth and the failure to have it removed also constituted deliberate indifference.

[6] In the Amended Complaint, plaintiff does not assert a claim for relief under the Fourth Amendment for excessive use of force against Woolverton. Plaintiff appears to acknowledge that removing Woolverton from his cell was necessary and that the "seizure" of his person was not a violation of the Fourth Amendment.

result of his medical condition.

    b.   KILLIAN's choice to leave Woolverton covered in OC spray when she knew he could not decontaminate himself and knew that this posed a substantial risk of harm because of his serious medical issues (primarily asserted as a deliberate indifference claim).

    c.   KILLIAN's failure to check on Woolverton, given his serious medical needs, after he was left on the cold cell floor for almost ten (10) hours with no follow-up after he was sprayed with OC spray, with no clothing, towels or mattress on a cold night (primarily asserted as a deliberate indifference claim).

III.
<u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A qualified immunity defense, however, alters the usual summary judgment burden of proof, such that governmental employees need only assert the defense in good faith, putting forth no evidence, to shift the burden to the non-movant to show the defense does not apply. *Davalos v. Johns*, 2013 WL 1820313, at *3-4 (N.D. Tex. Apr. 30, 2013)(citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). The non-movant must demonstrate how specific evidence in the record, and all reasonable inferences therefrom, viewed by the court in a light most favorable to the non-movant, presents a genuine, material fact dispute for trial regarding all essential elements of the claim(s). *Id.* at 4. "Conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment." *Id.* Plaintiff's failure to produce proof as to *any* essential element of the claim renders all other facts

regarding that claim immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007). Summary judgment is mandatory as to the claim in question if plaintiff fails to meet this burden. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994)(en banc)(per curiam).

Qualified immunity is a defense that protects government officials from suit when they exercise the discretionary functions of their office. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). In order to overcome a defense of qualified immunity, a plaintiff must establish that: "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established at the time of the challenged conduct.'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (citing *Ashcroft v. al-Kidd*, l31 S.Ct. 2074, 2080 (2011)). Plaintiff must demonstrate that the defendant's conduct was objectively unreasonable in light of the legal rules clearly established at the time of her actions. *Thomas v. City of Dallas*, 175 F.3d 358 (5th Cir. 1999). Conclusory allegations of wrongdoing will not satisfy these requirements. *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988). The court may examine these factors in any order. *Pearson v. Callahan*, 555 U.S. 223 (2009) *overruling in part Saucier v. Katz*, 553 U.S. 194 (2001). It is a plaintiff's burden to present evidence that a defendant is not entitled to qualified immunity when the defense is raised. *See Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001).

Claims of qualified immunity are not judged on twenty-twenty hindsight, or in light of knowledge ascertained after an event, but by looking through the eyes of the public official, considering what that official knew about the situation at the relevant time. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Poole v. City of Shreveport*, 691F.3d 624,630 (5th Cir. 20l2). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those

who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 34l (1986). "Pre-existing law

must dictate, that is, truly compel (not just suggest or allow or raise a question about), the

conclusion for every like-situated, reasonable government agent that what the defendant is doing

violates federal law in the circumstances." *See Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997)

(emphasis in original omitted). If officers of reasonable competence could disagree as to whether

the plaintiff's rights were violated, the officer's qualified immunity remains intact. *Tarver v. City

of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

IV.
THE LAW ON EXCESSIVE FORCE AND DELIBERATE
INDIFFERENCE UNDER THE EIGHTH AMENDMENT

A.  EXCESSIVE FORCE[7]

In addressing an excessive force claim brought under section 1983, analysis begins by

identifying the specific constitutional right allegedly infringed by the challenged application of

force. *Baker v. McCollan*, 443 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit" is "to

isolate the precise constitutional violation with which [the defendant] is charged"). In most

instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures

of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the

two primary sources of constitutional protection against physically abusive governmental

conduct. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The validity of the claim must then be

judged by reference to the specific constitutional standard that governs that right, rather than to

some generalized "excessive force" standard. *Id.* (*cf. Tennessee v. Garner*, 471 U.S. 1 (1985)

(claim of excessive force to effect arrest analyzed under a Fourth Amendment standard); *Whitley

v. Albers*, 475 U.S. 312 (1986) (claim of excessive force to subdue convicted prisoner analyzed

---

[7] Plaintiff does not make a claim for excessive force against BITTLE; the only claim plaintiff makes against this defendant is for deliberate indifference.

under an Eighth Amendment standard)).

In this instance, plaintiff alleges a violation under the Eighth Amendment for excessive force. The plaintiff does not appear to allege a violation of Woolverton's rights based on his physical removal from the cell to be taken to medical; rather, plaintiff objects to the manner of force used to extract Woolverton from the cell, which appears properly addressed under the Eighth Amendment standards on excessive force.

It is clearly established law that prison staff cannot act with deliberate indifference to a prisoner's "serious illness or injury." *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should also be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged. *Whitley*, 475 U.S. at 320. The deliberate indifference standard articulated in *Estelle* was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not *ordinarily* clash with other equally important governmental responsibilities. *Id*. However, the *Whitley* court recognized that sometimes responding to the medical needs of inmates can clash with "the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)). Woolverton's case presents a situation where prison guards were tasked with transporting an inmate with a history of sometimes violent non-compliance, who was housed in the administrative segregation section of the unit, to the medical department.

The "core judicial inquiry" into a plaintiff's claim of excessive force under the Eighth Amendment is "whether force was applied in a good-faith effort to maintain or restore discipline,

or maliciously and sadistically to cause harm." *Martin v. Seal*, 510 F. App'x 309, 312 (5th Cir. 2013) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). The inquiry has two components: (1) an objective one that focuses on whether the alleged wrongdoing was nontrivial and harmful enough to violate the constitution and (2) a subjective one that focuses on the mental state of the alleged wrongdoer. *Hudson*, 503 U.S. at 7-8. The courts look to five nonexclusive factors to make this determination:

1. the extent of the injury suffered;
2. the need for the application of force;
3. the relationship between this need and the amount of force used;
4. the threat reasonably perceived by the responsible officials; and
5. any efforts made to temper the severity of a forceful response.

*Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998) (citing *Hudson*, 503 U.S. at 7). The Court can consider these factors in any order. *Id*. "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.' " *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The circumstances of this particular case involve the requirements for security personnel to perform a strip search and secure a prisoner in handcuffs before opening the cell of a prisoner located in an administrative segregation cellblock. The type of force used involves chemical agents sprayed into a closed cell of an inmate who is not secured in handcuffs. The inmate in question has a history of sometimes violent noncompliance with orders and a history of "playing possum" and pretending to be sick and then "flipping the switch" and becoming violent with staff; but the inmate is also experiencing an urgent medical need according to medical staff.

The Seventh Circuit has performed a detailed and instructive analysis of these types of

excessive force cases. It is a violation of the Eighth Amendment for prison officials to use mace

or other chemical agents in quantities greater than that necessary or for the sole purpose of

punishment or the infliction of pain; however, the use of mace, tear gas, or other chemical agents

of like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant

prisoners does not constitute cruel and inhuman punishment, even if the inmate is locked in his

prison cell or is in handcuffs. *See Soto v. Dickey*, 744 F.2d 1260, 1262-64 (7th Cir. 1984). The

court ruled that the use of mace, in itself, is not a per se a violation of the Eighth Amendment. *Id.*

In researching instances where prison officials deployed mace or chemical agents on prison

inmates, the Court found most of the instances where this form of discipline was deployed on

inmates occurred when inmates were locked in their cells or in the strip cage, not while inmates

were outside or in the general population. *Id*. Mace was also typically deployed in response to

conduct violations like when an inmate acted with disrespect or disobeyed orders, or when

inmates threw liquids from their cells, yelled obscenities, refused to remove objects that blocked

doors, refused to return a meal tray, refused to properly submit to a strip search, or refused to be

double-celled. *Id*. The court determined that the use of chemical agents in these circumstances

can be appropriate prison discipline and not were not necessarily used maliciously to cause harm

because such use "prevent[s] a *perceived future danger*." *Id*. at 1270 (emphasis added).

Requiring compliance with officer orders is part of insuring prison discipline and the courts

should be extremely hesitant in "attempting to prohibit or limit the necessary means by which

[prison guards] may carry out this responsibility." *See id*. at 1270-71.

Defendant KILLIAN argues in her brief attached to the Joint Motion that plaintiff failed

to allege that she authorized the use of excessive force against Woolverton. [ECF 220 at 18].

When plaintiff responded by stating the alleged facts were sufficient to raise liability under

section 1983, defendant KILLIAN adopted the arguments set forth in the responsive brief filed by Gruver, Gratz, and Seymour. [ECF 245 at 2]. The Court finds that plaintiff asserted a claim by alleging that KILLIAN "summoned" officers to Woolverton's cell and was part of "choosing" to use OC spray. [ECF 77 at 21]. KILLIAN had a role in the authorization of the use of chemical agents.

1. *The threat reasonably perceived by the responsible officials (the fourth factor)*

In considering the plaintiff's claims, the undersigned finds it most useful to consider the *Hudson* five-factor test in accordance with the chronology of events that occurred on October 22, 2013. The Court will first consider what threat was reasonably perceived by KILLIAN that constituted a need for the use of force, which is the fourth *Hudson* factor.

The Court must always look at the context in which the force was used to determine if such force was excessive. *See Baldwin v. Stalder*, 137 F.3d 836, 840 (5th Cir. 1998) ("Needless to say, '[t]he amount of force that is constitutionally permissible ... must be judged by the context in which that force is deployed' "); *see also Chambers v. Johnson*, 372 Fed. Appx. 471 (5th Cir. 2010) (recognizing that if, as the plaintiff asserted, he complied with the orders of security officers, "then the defendants could not have reasonably perceived any threat requiring a need to use force"); *Peterson v. Peshoff*, 216 F.3d 1079 (5th Cir. 2000) (finding that an inmate's plaintiff's claim "that correctional officers used excessive force by wantonly and maliciously spraying him with mace without provocation while he was confined in his cell" was not frivolous).

The Court notes that an excessive force claim against medical personnel is not as typical as such a claim against prison officers. The Clements Unit at TDCJ has a very specifically worded Use of Force Plan (hereinafter the "Plan") that addresses using *planned* force against an

inmate. At the Clements Unit, planned force always *necessarily* involves the participation of medical staff. This type of force is not the typical force that must be exerted immediately to prevent harm in an exigent emergency situation to protect property or people, but rather is the type of force used on prisoners who are non-compliant with verbal orders that must be followed for one reason or another. For example, the district court in *Thomas v. Walton*, recognizing that it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain, held that a prisoner's repeated refusal to comply with an order to submit to a strip search during a cell inspection justified spraying him with a chemical agent, such that the spraying did not involve the use of excessive force. 461 F. Supp. 2d 786 (S.D. Ill. 2006). In reaching that decision, the court considered the fact that the chemical was not used in a quantity greater than necessary to subdue the prisoner, secure his compliance with the order, and assure the safety of the officers, as well as the fact that the prisoner, who was being held in segregation in a maximum security prison, had a history of assaults on correctional officers. *Id*. In so holding, the court stated, in an excessive force case, an inmate's disciplinary history, as well as the fact that the incident involving alleged excessive force involved an inmate in segregation at a maximum security institution, is relevant to the issue of the appropriateness of the force used. *Id*. Although KILLIAN would be aware Woolverton was housed in the administrative segregation unit for prisoners who had disciplinary issues, the Court must determine KILLIAN's knowledge of Woolverton's *ability* to comply with verbal orders to determine if her role in authorizing chemical agents was reasonable here.

In this instance, the Plan has created a system that requires medical staff to be part of the use of force decision-making process. By doing so, it subjects medical staff to the same

considerations as security personnel shift supervisors, and it requires the Court to determine the knowledge the individual medical staff have prior to authorizing force to be used on physically or mentally ill inmates. To some degree, it makes sense to the Court that medical staff has the most knowledge of an inmate's physical and mental condition and the best ability to address emergency medical concerns during a use of force; thus, having these concerns addressed during a *planned* use of force is appropriate. On the other hand, medical staff present at a *planned* use of force then become responsible, to some degree, for the force that is ultimately determined necessary by security personnel.

The question before the Court is whether plaintiff has raised a fact question concerning whether KILLIAN had a duty to inform Gruver, Gratz or Seymour about Woolverton's mental health issues and physical ailments in order to assist them in determining if Woolverton presented a threat to medical personnel either if lesser force was used or if security staff were to forego the use of OC spray before entering the cell. The Court finds plaintiff has sufficiently raised this fact question.

Here, KILLIAN summoned Gratz to Woolverton's cell because she determined that extracting Woolverton from his cell was medically necessary because he was gravely ill. [ECF 237 at 203-205, 210, 240]. KILLIAN had access to Woolverton's medical records and knew about his mental health issues, his physical ailments, and his danger of death from kidney failure. [ECF 237 at 180-181, 187-189, 193, 214-15, 231]. KILLIAN admitted she did not inform Gruver, Gratz or Seymour about Woolverton's asthma or other medical or mental conditions. [ECF 237 at 229]. BITTLE testified his understanding of the Plan is that it is the nurse's responsibility to inform security officers that a "do not gas" designation exists and also to either

advise against using OC spray in those situations or to approve of its use if the medical situation

permits it. [ECF 237 at 127, 158-59]. Plaintiff's expert, Schwartz, stated that his interpretation of

the Plan for using force placed the burden on security personnel to contact medical staff or have

them present, and also placed the burden on medical staff to speak up about any concerns. [ECF

237 at 319-334].

   2.  *The need for the application of force (the second factor)*

        The question before the Court is to what extent the plaintiff has raised a fact question

regarding KILLIAN's knowledge of Woolverton's medical conditions, such that he may have

posed a lesser threat to security personnel and TDCJ staff, as he was potentially unable to

comply or that his "refusal" to stand actually indicated an "inability" to be rational or a physical

inability to comply. The Court finds that plaintiff has raised a fact question regarding this

*Hudson* factor.

        Plaintiff's expert, Jeffrey Schwartz, stated that "Ms. Killian would know that choosing

not to inform Lt. Seymour of information about Mr. Woolverton throughout the morning

suggesting that he was physically incapacitated left the officers in command of the process

…*grossly under informed* in a way that increased the risk they would use excessive force." [ECF

237 at 335, (emphasis added)]. The Court has already noted that KILLIAN was aware of

Woolverton's mental health history and physical deterioration on the day force was used against

him and that she failed to share this information. The Court agrees that the expert's report,

combined with these facts, raises a serious question about the amount of force security personnel

may have viewed was necessary if they had all relevant information concerning Mr. Woolverton.

   3.  *The relationship between the need for force and the amount of force used (factor three)*

        Although the use of chemical agents, specifically OC spray, is typically considered

minimal force after verbal intervention, the Court finds it must consider whether KILLIAN's knowledge of Woolverton's medical and mental conditions would have allowed for a lesser use of force if conveyed to security personnel.

Woolverton was sprayed twice with OC spray. [video 1 at 3:56, 7:30]. KILLIAN, knowing Woolverton's condition, did not attempt to reason again with Woolverton after the first use of spray, nor did she look into his cell to determine if he was having breathing problems, which would hinder him from responding to the first use of the spray. *Id*. The Court, having determined a fact question exists concerning KILLIAN's role in the authorization of using any force against an inmate with Woolverton's history, must also find a fact question exists as to whether her *inaction* led to greater use of force than was necessary, if in fact, force was necessary at all.

4. *The efforts made to temper the severity of the force used (factor five)*

The Court once again finds this factor weighs in plaintiff's favor because a fact question is created by KILLIAN's failed effort to inform security personnel of Woolverton's issues.

5. *The extent of the injury suffered (factor one)*

Upon review of the summary judgment evidence, this factor presents a fact question that weighs in favor of the plaintiff. Although the autopsy report submitted as summary judgment evidence does not indicate that Woolverton died because of a reaction to OC spray, the report does state, "…the lungs show moderate congestion and edema." [ECF 221 at 68-78]. Further, plaintiff's expert, Dr. Beam, states, "the application of OC spray without the patient's asthma being considered was against [TDCJ] protocol. I doubt that it alone caused death but believe that it accelerated the death of this already failing man." [ECF 237 at 176]. The plaintiff's expert

opinion evidence, combined with the autopsy report and excerpts of medical records [ECF 237 at 1-73, ECF 221 at 19-67], create a fact question about the extent of the injury caused to Woolverton by KILLIAN's actions or inactions that resulted in two applications of OC spray, failing to remove or object to a mask placed over his mouth, and failing to decontaminate him of OC spray. Ultimately, it is clear that Woolverton died shortly after these events from a progressive kidney disease, which may have been exacerbated by the use of force.

## B.  DELIBERATE INDIFFERENCE

Deliberate indifference "is an extremely high standard to meet." *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 882 (5th Cir. 2004). ("We begin by emphasizing that our court has interpreted the test of deliberate indifference as a significantly high burden for plaintiffs to overcome."). A prison official acts with deliberate indifference "only if (A) he knows that inmates face a substantial risk of serious bodily harm and (B) he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Reeves v. Collins*, 27 F.3d 174, 176–77 (5th Cir. 1994)). Unsuccessful medical treatment, acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. *Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999); *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

"Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos*, 41 F.3d at 235 (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193–95 (5th Cir. 1993)); *Bejaran v. Cruz*, 79 Fed.Appx. 73, 74 (5th Cir.

2003) (stating that "Bejaran's admission in his complaint that the prison medical staff took x-rays of his back and ... gave him 'generic,' 'mild medications' refute his assertion of deliberate indifference to his medical needs"). "The decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle*, 429 U.S. 97, 107 (1976)). A showing of deliberate indifference requires the prisoner to submit evidence that prison officials " 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). The Fifth Circuit has defined a "serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that *even a layman* would recognize that care is required." *Gobert*, 463 F.3d at 345 n.12 (emphasis added).

 "Deliberate indifference is more than mere negligence or even gross negligence." *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010). Specifically, negligent medical care does not constitute a valid section 1983 claim. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). A plaintiff is not entitled to the "best" medical treatment available. *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978). A misdiagnosis and the resulting inadequate medical care do not violate the Constitution. *See Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); *see also Garrett v. Univ. of Tex. Med. Branch*, 261 Fed. App'x. 759, 760 (5th Cir. 2008) (finding no deliberate indifference despite alleged misdiagnosis and incorrect treatment because plaintiff failed to prove defendant *intentionally* treated him incorrectly).

Deliberate indifference only encompasses "unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *Domino*, 239 F.3d at 756. BITTLE did not ignore Woolverton's sick call requests or refuse to treat him. [ECF 237 at 1-73, ECF 221 at 19-67]. Instead, BITTLE issued several orders regarding the care of Woolverton's neurogenic bladder, asthma and other conditions. *Id*. BITTLE first treated Woolverton at the Clements Unit on July 30, 2013 and continued to provide treatment until Woolverton's death. [ECF 237 at 2-73]. BITTLE had specific knowledge of Woolverton's mental health conditions, weight loss, chronic kidney disease, problems with self-catheterization, seizure disorder and asthma from Woolverton's charts and medical records. [ECF 237 at 13, 17]. BITTLE relied on nurses' assessments and his own personal observations in making medical decisions. [ECF 237 at 157]. BITTLE had knowledge Woolverton had dementia associated with chronic kidney disease and that Woolverton was on the "do not gas" list. [ECF 237 at 17-19]. BITTLE knew Woolverton had complained that chemical agents on his cellblock aggravated his asthma condition. [ECF at 39-43]. Woolverton's medical records from September 2013 through October 2013 indicated a rapidly worsening issue with his neurogenic bladder and kidneys and with Woolverton's compliance with self-catheterization. [ECF 237 at 43-73]. Woolverton experienced repeated kidney infections and signs of mental deterioration during this time. *Id*.

BITTLE also reviewed Woolverton's medical records and performed an examination of him when Woolverton was brought to the medical unit on October 22, 2013. [video1 at 23:32-26:05, part 2, 0:00-1:15, ECF at 81-83, 107, 133-34]. BITTLE ordered testing to determine if infection was present. [ECF 237 at 73, 145-46]. BITTLE had knowledge of Woolverton's worsening conditions and did provide care and diagnostic testing to Woolverton on October 22, 2013. Even if these tests were inadequate for Woolverton's condition, negligent care, even

grossly negligent care, does not rise to the level of deliberate indifference.

Significantly, BITTLE took no part in the decision to authorize the use of OC spray on Woolverton. To establish deliberate indifference, the plaintiff must demonstrate culpability beyond mere negligence or even gross negligence. *Conner v. Travis Cnty.*, 209 F.3d 794, 796 (5th Cir. 2000); *see Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992) (stating that the basis of section 1983 liability "must amount to an intentional choice, not merely an unintentionally negligent oversight"). Although these terms are sometimes used interchangeably, "gross negligence" and "deliberate indifference" involve different degrees of certainty, on the part of an actor, that negative consequences *will result* from his act or omission. Whereas the former is a "heightened degree of negligence," the latter is a "lesser form of intent." *Germany v. Vance*, 868 F.2d 9, 18 n.10 (1st Cir. 1989) (citing *Doe v. Taylor*, 15 F.3d 443, 453 n. 7 (5th Cir. 1994)) (distinguishing "deliberate indifference" from "gross negligence" by noting that deliberate indifference was a "stricter standard" involving intentional behavior based on actual knowledge of risk).

The Court finds KILLIAN's situation is different from BITTLE's situation in this case. The Court determined above that KILLIAN's authorization for the use of OC spray on Woolverton may have constituted excessive force, if the jury determines KILLIAN had the requisite intent. KILLIAN's own deposition testimony indicates her knowledge of the risk of death Woolverton faced from his worsening chronic condition and the need for urgent care on October 22, 2013. [ECF 237 at 180-181, 187-189, 193, 214-15, 231]. She also indicated her awareness of his mental health conditions and possible explanations for non-compliant behavior. *Id*. Plaintiff has further provided the Court with the Plan that indicates security personnel relied on medical staff to inform them of contraindications in uses of planned force, such as the one at

issue here. Additionally, plaintiff provided expert reports[8] regarding the standard of care KILLIAN owed Woolverton as a nurse in a use of force situation. The record demonstrates KILLIAN authorized the use of chemical agents on Woolverton by failing to inform Gruver, Gratz, or Seymour about Woolverton's asthma and declining mental and physical conditions prior to the use of force. The record further demonstrates KILLIAN returned Woolverton to his cell and realized not only that he would not be decontaminated by TDCJ security personnel before leaving the cell, but also realized that no follow-up care and observation was ordered despite Woolverton's asthma condition and continued contamination by chemical agents.

Plaintiff has provided expert reports concerning using OC spray on asthmatic inmates, especially those in acute distress from other conditions; these reports, coupled with KILLIAN's actual knowledge of Woolverton's deterioration, create a fact question about KILLIAN's knowledge that negative consequences *would result* if she: (1) did not inform security personnel about the risks involved in gassing inmate Woolverton; (2) did not make sure Woolverton was decontaminated or report his continuing pain involving the contamination after his return to the E-pod; and (3) did not provide follow-up care or check on Woolverton after his return to the E-pod. Specifically, plaintiff has raised a fact question that KILLIAN violated clearly established law by failing to do these things; thus, a jury must decide KILLIAN's credibility regarding the intent behind her actions on October 22, 2013. The Court cannot judge credibility as to an actor's intent in fact questions and must construe all evidence in the light most favorable to the plaintiff.

Prior to the use of force involving chemical agents on October 22, 2013, KILLIAN summoned Gratz to Woolverton's cell and insisted he be transported to the medical department.

---

[8] The Court notes that plaintiff has submitted expert reports regarding the medical care provided by KILLIAN and BITTLE that contain a significant number of legal conclusions. The Court did not consider these legal conclusions in crediting the expert reports and did not use them in determining if any fact questions exist for summary judgment purposes. The Federal Rules do not permit expert witnesses to offer legal conclusions. *C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 697 (5th Cir. 2001).

[ECF 237 at 240, 256]. KILLIAN reviewed Woolverton's chart before going to his cell that day and knew he had asthma and knew he was on the "do not gas" list. [ECF 237 at 196-198]. KILLIAN did not inform security personnel of Woolverton's asthma prior to the use of OC spray. [ECF 237 at 239]. Plaintiff's expert, Nurse Vickie Schlone, opined, "as a licensed vocational nurse in the state of Texas, LVN Killian was aware that asthma is a serious illness and that an asthma attack can have serious consequences and result in death, and that asthma can be dangerously aggravated by exposure to OC spray." [ECF 237 at 309]. Although Schlone goes on to make legal conclusions that KILLIAN's "lack of intervention is beyond gross negligence and fully meets the definition of deliberate indifference," the Court did not consider these statements in making the determination that a fact question exists in this instance. *Id.* Nevertheless, in the face of KILLIAN's *admitted* medical knowledge and knowledge of the risks to Woolverton, she had a duty, when she realized OC spray would be deployed, to inform security personnel that the use of OC spray was not minimal force in this instance. This likely would have prevented the use of force per the Plan. A fact question exists as to whether she believed negative consequences would result – further indicated by her testimony regarding her "purpose" in being present at the scene, which was to address any asthma attack that may arise.

KILLIAN's failure to decontaminate Woolverton, or to alternatively insist he be decontaminated by security personnel, also creates a fact question about her possible deliberate indifference towards Woolverton. KILLIAN had the medical knowledge about the serious risks involved in gassing an asthmatic inmate, and she had the specific knowledge of Woolverton's asthma condition and his other serious medical needs. This knowledge raises the question of whether KILLIAN acted with deliberate indifference by failing to act to alleviate the known serious risk to Woolverton.

In contrast to KILLIAN, the plaintiff's expert reports and other competent summary judgment evidence do not raise a fact question that BITTLE acted with deliberate indifference. Once Woolverton was extracted from his cell, he was taken to the medical department where BITTLE examined him and ordered diagnostic testing. [video1 at 23:25-26:05, part 2 0:00-1:15, ECF 237 at 73, 145-46]. BITTLE testified that in these forcible extraction situations, his initial examination is "cursory." [ECF 237 at 148]. BITTLE did not order decontamination, but KILLIAN testified that "medical staff don't assist" with decontamination in these situations. [ECF 237 at 218].

The medical records in general indicate that Woolverton was seen by medical personnel on a regular basis upon his arrival at the Clements Unit until the time of his death. [ECF 237 at 1-73]. As noted before, there is a scarcity of medical records submitted as summary judgment evidence between 3:03 a.m. on the morning of October 19, 2013 until 9:00 a.m. the morning of October 22, 2013. [ECF 221 at 19-67, ECF 237 at 1-73]. However, this lack of documentation does not show BITTLE refused to treat Woolverton, ignored his complaints, or deliberately treated him incorrectly. Although the evidence in the record may provide a basis to support that BITTLE likely acted with some degree of negligence toward Woolverton during his medical examination on October 22, 2013, the Court does not find evidence that BITTLE had a role in the authorization of the use of OC spray or direct knowledge of the continued lack of decontamination after his return to E-pod.

V.

RECOMMENDATION

For the reasons set forth above, it is the RECOMMENDATION of the Magistrate Judge to the District Judge that the "Motion for Summary Judgment on the Defense of Qualified Immunity" filed by defendants BITTLE, KILLIAN, and SHOOK be GRANTED IN PART and

DENIED IN PART. Specifically, it is the RECOMMENDATION of the Magistrate Judge that summary judgment be DENIED as to plaintiff's Eighth Amendment excessive force and deliberate indifference claims as to KILLIAN; summary judgment be GRANTED as to plaintiff's Eighth Amendment deliberate indifference claims as to BITTLE and SHOOK. It is the RECOMMENDATION of the Magistrate Judge that defendants BITTLE and SHOOK be dismissed from this lawsuit, as they are entitled to immunity on all claims asserted against them.

VI.

<u>INSTRUCTIONS FOR SERVICE</u>

The United States District Clerk is directed to send a copy of this Findings, Conclusions and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED on June 20, 2018.

_____
LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## *<u>NOTICE OF RIGHT TO OBJECT</u>*

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).

Civil\215-314-Woolverton\MEDICAL.MSJ