IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CHRISTOPHER THOMAS WOOLVERTON, in his individual capacity and as personal representative of the Estate of CHRISTOPHER DOUGLAS WOOLVERTON, | § § § § § § | |
| Plaintiffs, | § § | Civil Action No. 2:15-CV-314-D |
| VS. | § § | |
| WARDEN BRAD LIVINGSTON, et al., | § § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

On June 20, 2018 the United States Magistrate Judge entered her findings, conclusions, and recommendations that are before the court for *de novo* review and that address three summary judgment motions: (1) defendants Major Michael Gruver ("Major Gruver"), Sergeant Andrew Gratz ("Sgt. Gratz"), and Lieutenant Matthew Seymour's ("Lt. Seymour's") September 26, 2017 motion for summary judgment limited to the defense of qualified immunity; (2) defendants Warden Barry Martin ("Warden Martin"), Assistant Warden Gregory David ("Warden David"), and Assistant Warden James Beach's ("Warden Beach's") September 26, 2017 motion for summary judgment limited to the defense of qualified immunity[1]; and (3) defendants Charles Bittle, Jr., M.D. ("Dr. Bittle"), Debra Killian

---

[1]Because plaintiffs did not oppose the motion as to Warden Martin and Warden Beach, Judge Robinson granted the unopposed motion for summary judgment as to these defendants and entered a final judgment in their favor.

("Killian"), and James Shook's ("Shook's") September 22, 2017 motion for summary judgment.[2]  After making an independent review of the pleadings, files, and records in this case, and the findings, conclusions, and recommendations of the magistrate judge, the court concludes that the findings and conclusions are correct in part.  It is therefore ordered that the findings, conclusions, and recommendations of the magistrate judge are adopted in part, and, to the extent the court disagrees with the magistrate judge's findings, conclusions, and recommendations, the summary judgment motions are decided as set out in this memorandum opinion and order.[3]

I

Without suggesting that the court agrees in every respect with the magistrate judge's analysis, the court concludes that the magistrate judge is correct in recommending that defendants Warden David, Sgt. Gratz, and Lt. Seymour are entitled to summary judgment on the basis of qualified immunity on plaintiffs' § 1983 excessive force and deliberate indifference claims, and that defendants Major Gruver and Dr. Bittle are entitled to summary judgment on the basis of qualified immunity on plaintiffs' § 1983 deliberate indifference claim.  It is therefore ordered that the recommendations of the United States Magistrate Judge

_____

[2]Two of these motion were filed under seal.  The third motion was not filed under seal, but the supporting brief was.  Because the magistrate judge's findings, conclusions, and recommendations are not filed under seal, however, the court has not sealed this memorandum opinion and order.

[3]The findings, conclusions, and recommendations of the magistrate judge refer to a single plaintiff.  But as the first amended complaint and plaintiffs' summary judgment opposition responses reflect, there are two plaintiffs.

are adopted as to these defendants and claims. The court also adopts the magistrate judge's findings, conclusions, and recommendation to grant the unopposed motion for summary judgment filed by defendant Shook.

II

The court concludes following *de novo* review that the magistrate judge is correct in concluding that defendant Killian is not entitled to summary judgment on the basis of qualified immunity as to plaintiffs' Eighth Amendment-based § 1983 excessive force claim. The court relies, however, on the following reasoning, which differs somewhat from the reasoning of the magistrate judge.

Killian moves for summary judgment on the basis of qualified immunity with respect to plaintiffs' Eighth Amendment excessive force claim on the following ground:

> [i]n an excessive force claim, the question is whether the force was used maliciously and sadistically to cause harm. There are no allegations in Plaintiffs' complaint, nor is there any evidence, that Nurse Killian used force against [Christopher Douglas Woolverton ("Woolverton")], or that she authorized that excessive force be used against Woolverton. This claim is . . . subject to dismissal.

Bittle, Killian, Shook 9/22/17 Br. at 17-18 (citations omitted). The magistrate judge concluded that "plaintiff asserted a claim by alleging that KILLIAN 'summoned' officers to Woolverton's cell and was part of 'choosing' to use [oleoresin capsicum ("OC")] spray. KILLIAN had a role in the authorization of the use of chemical agents." Mag. J. Rec. (ECF # 264) at 16. The court agrees.

It is clearly established that "[f]or there to be liability under section 1983, a defendant

must have been personally involved in the conduct causing a deprivation of constitutional rights, or there must be a causal connection between the actions of that person and the constitutional right sought to be redressed." *King v. Louisiana*, 294 Fed. Appx. 77, 83 (5th Cir. 2008) (per curiam) (citing *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983)) (affirming dismissal of claims against individual defendants, based on qualified immunity, where the allegations against these defendants failed to set forth any constitutional violation). The amended complaint alleges that defendants, including Killian, "summoned" officers because Woolverton was motionless and almost completely unresponsive on the floor of his cell, Am. Compl. ¶ 69(b), and intentionally subjected Woolverton to cruel and unusual punishment by, *inter alia*, "choosing to use OC spray on Mr. Woolverton on October 22, 2013 when he was having a medical crisis and almost completely unresponsive, and despite the 'do not gas' classification," *id*. ¶ 69(a). These allegations sufficiently plead Killian's personal participation in the events of October 22, 2013.

In addition, based on the summary judgment evidence, a reasonable jury could find that Killian personally participated in the use of OC spray against Woolverton. It is undisputed that it was Killian who requested that Woolverton be extracted from his cell and that Killian was present during the entire use of force, the medical examination that followed, and the return of Woolverton to his jail cell. The Texas Department of Criminal Justice ("TDCJ") Use of Force Plan ("Plan") states, in relevant part, that "[p]rior to the use of chemical agents, where circumstances permit, medical and mental health staff shall be consulted, and medical records shall be reviewed to determine if the use of chemical agents

would be detrimental to the mental or physical health of the offender involved." Ps. 11/1/17 App. (ECF # 237) at 286. Killian admitted during her deposition that her presence was required before security could use OC spray against Woolverton; Warden Beach, the Assistant Warden of the Clements Unit on October 22, 2013, explained that "as long as medical is present at the planned use of force *and does not object*, then officers are permitted to use chemical spray on an inmate, pursuant to the [Plan]," *id.* at 290 (emphasis added); and Dr. Bittle testified that Killian was responsible for reviewing medical records to determine whether the use of chemical agents would be detrimental, that the on-duty nurse "would make a nursing assessment as to whether or not it was safe to use a chemical agent," *id.* at 155, and that the on-duty nurse had the ability to tell security "to not do it, as well as to go ahead," *id.* at 158. Based on this evidence, a reasonable jury could find that Killian personally participated in the use of force on October 22, 2013.

Defendants rely on no other ground to establish that Killian is entitled to qualified immunity from liability as to Woolverton's Eighth Amendment use of force claim.[4]

---

[4]In their reply brief, defendants state: "[t]o the extent Plaintiffs claim the force used to bring Woolverton to the examination room on October 22, 2013, was excessive, Nurse Killian adopts the arguments made by Defendants Gruver, Seymour and Gratz as stated in their brief in support of their motion for summary judgment." Bittle & Killian 11/14/17 Reply at 2. The arguments raised in Gruver, Seymour, and Gratz's summary judgment brief were not presented in Killian's motion for summary judgment, however, and the court will not consider new arguments raised for the first time in a reply brief. *See, e.g., Jacobs v. Tapscott*, 2006 WL 2728827, at *7 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.) ("[T]he court will not consider an argument raised for the first time in a reply brief." (citing *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (Fitzwater, J.)), *aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008). It is also error to grant summary judgment on a ground that has not been properly raised in the motion. *See,*

Accordingly, the court denies the motion as to this claim against Killian.

III

The court concludes that Major Gruver is entitled to summary judgment on the basis of qualified immunity with respect to plaintiffs' Eighth Amendment-based § 1983 excessive force claim.

A

"[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). When assessing whether a defendant used excessive force in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, the "core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. at 7. To determine whether the use of force was excessive, the court evaluates five nonexclusive factors, often referred to as the "*Hudson*" factors: (1) the extent of the injury suffered by the inmate; (2) the need for the application of force; (3) the relationship between the need for force and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) efforts made to temper the severity of a forceful response. *Id.* (citation omitted). The core inquiry focuses on the nature of the force used; a plaintiff need not show that his injuries were significant, although the extent of the injury

---

*e.g., John Deere Co. v. Am. Nat'l Bank, Stafford*, 809 F.2d 1190, 1192 (5th Cir. 1987).

- 6 -

may provide some indication of the amount of force applied and may suggest whether the use of force could plausibly have been thought necessary in a particular situation. *See, e.g., Wilkins v. Gaddy*, 559 U.S. 34, 37-39 & n.2 (2010). "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." *Id.* at 38.

Under the third *Hudson* factor, the magistrate judge concluded that a fact issue precluded summary judgment in favor of Major Gruver on plaintiffs' Eighth Amendment excessive force claim. The magistrate judge reasoned:

> Gruver had knowledge that was not available to GRATZ or SEYMOUR. GRUVER testified that he had recently reviewed the October 7, 2013, use of force video regarding Woolverton, shortly before the October 22, 2013 incident occurred. On that video, Woolverton's asthma condition was clear. Plaintiff has raised a fact question of GRUVER's knowledge of Woolverton's asthma condition by asserting that GRUVER had reviewed all of the use of force evidence from the October 7, 2013 incident. GRUVER testified that the guards had "constant" consultation with medical during the entire use of force process. Plaintiff's evidence contained the Plan for using force at the Clements Unit, which attributes to GRUVER the knowledge that OC spray is not permitted where "use of chemical agents would be detrimental to the mental or physical health of the offender." Finally, plaintiff submitted an expert report, prepared by TDCJ use of force expert Jeffrey Schwartz, opining that TDCJ supervisors should have knowledge that chemical agents should not be used as a first line force on inmates with asthma. This specifically creates a fact question of whether GRUVER was aware that OC spray did not constitute lesser force in Woolverton's case.

Mag. J. Rec. (ECF # 262) at 33-34. The court disagrees with the magistrate judge's conclusion that plaintiffs have raised a fact question regarding Major Gruver's knowledge of Woolverton's asthma condition prior to the use of chemical agents on October 22, 2013.

The magistrate judge concludes that Woolverton's asthma condition is clear on the October 7, 2013 use-of-force video ("Video"). Viewed in its entirety, however, the Video actually suggests the opposite. In the Video, although Woolverton appears to exhibit difficulty breathing immediately after the use of OC spray, there is nothing that would have led Major Gruver to conclude that Woolverton's apparent breathing difficulty was the result of his having asthma, as opposed to, for example, his feigning an illness or the effects of the chemical spray. The Video shows that, once Woolverton arrived in medical, the staff nurses began to examine him. Although Woolverton replied "Yes" when asked whether he had asthma, an unidentified nurse in the video specifically stated that Woolverton is *not* asthmatic. Killian, who was present that day, stated to Woolverton that his "pulse-ox is good," meaning that his blood oxygen levels were normal. Once medical released Woolverton, he immediately became belligerent, spit on an officer, and proceeded to yell and curse at the officers, no longer showing any signs of difficulty breathing. The court concludes that the Video, when viewed in its entirety, is at best inconclusive on the question whether Woolverton had asthma.

Other evidence in the record supports the conclusion that Major Gruver did *not* have knowledge of Woolverton's asthma. Major Gruver testified at his deposition that the Clements Unit, where Woolverton was housed, did not have a use of force contraindications list because medical staff was present 24 hours a day, and "when we have a preplanned use of force, they're with us, they're at the . . . scene of the use of force, they are cell side, they are with the team." Gruver, Gratz, Seymour 9/26/17 App. at 50. Major Gruver also testified

- 8 -

that, as a security officer, he would have had no way of knowing whether Woolverton was on any contraindications list, and that he was not, in fact, aware that Woolverton was included on any such list. *Id.* Moreover, it is undisputed that, during the October 22, 2013 use of force, Killian was present[5] before, during, and after the use of OC spray and never objected to the use of chemical agents based on any perceived "detriment[] to [Woolverton's] mental or physical health." P. 11/1/17 App. (ECF # 240) at 197.

The third *Hudson* factor examines the relationship between the need for force and the amount of force used. At the time Major Gruver authorized the use of chemical agents to obtain Woolverton's compliance, he was aware that Woolverton was a level 3A offender being housed in administrative segregation in the jail's most secure area; that Woolverton was one of the jail's most aggressive inmates; that Woolverton had had disciplinary problems in the past (including as recently as October 7, 2013); that Woolverton was known to have violent and aggressive outbursts; and that Woolverton was not complying with orders to submit to strip search and hand restraint procedures so that he could be escorted to medical. Under normal circumstances, the use of chemical agents to gain compliance with jail procedures results in no more than a *de minimus* injury, *see, e.g., Martinez v. Nueces County, Texas*, 2015 WL 65200, at *10 (S.D. Tex. Jan. 5, 2015) (citing cases), and constitutes a lesser use of force than physical force. And plaintiffs have not created a genuine issue of material

---

[5]Major Gruver testified that, although he did not speak personally with Killian or Dr. Bittle, his staff was in "constant consultation with medical, which was [his] understanding of the policy." Gruver, Gratz, Seymour 9/26/17 App. at 49.

fact on the question whether Major Gruver would have known, based on his having recently viewed the Video, that Woolverton had asthma—in which case the use of OC spray could result in more than a *de minimus* injury. Accordingly, the court concludes that plaintiffs have not created a fact question on the third *Hudson* factor—the relationship between the need for force and the amount of force used—with respect to Major Gruver.

Regarding the remaining *Hudson* factors, the magistrate judge correctly concluded that plaintiffs have not created a genuine issue of material fact on the question whether the authorization to use chemical agents to coerce Woolverton into compliance with strip search and hand restraint procedures so that he could be transported to medical was excessive.[6] Accordingly, because plaintiffs have failed to establish that authorizing the use of OC spray constituted excessive force, in violation of Woolverton's Eighth Amendment rights, the court grants Major Gruver's motion for summary judgment dismissing, based on qualified immunity, plaintiffs' Eighth Amendment-based § 1983 claim.

B

Alternatively, the court concludes that Major Gruver is entitled to qualified immunity on plaintiffs' Eighth Amendment excessive force claim because his conduct was objectively reasonable. *See Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) ("Even if the

---

[6]As the magistrate judge correctly noted, her finding that a fact issue exists regarding the severity of injury Woolverton sustained does not alter the court's conclusion that Major Gruver did not violate Woolverton's Eighth Amendment rights when he authorized the use of force. *See* Mag. J. Rec. (ECF # 262) at 36 ("By raising this fact question, plaintiff has not defeated entitlement to qualified immunity; even if a significant injury was caused by the use of force, the plaintiff must still show the force used was excessive to the threat perceived.").

government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable.").

In general, objective reasonableness turns on the "facts and circumstances of each particular case," from the perspective of a reasonable officer at the scene, including what that officer knew at the time—and without the crystal clarity of hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The "management by a few guards of large numbers of prisoners" in a jail "may require and justify the occasional use of a degree of intentional force." *Kingsley v. Hendrickson*, ___ U.S. ___, 135 S. Ct. 2466, 2475 (2015) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The court must also consider the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979). Indeed, "[r]unning a [jail] is an inordinately difficult undertaking," *Turner v. Safley*, 482 U.S. 78, 84-85 (1987), and "safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012). Officers facing disturbances in a jail "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. A judge, who has ample time to reflect on the matter in the solitude of chambers, must be mindful of these considerations when deciding whether an officer's use of force was objectively reasonable.

At the time Major Gruver authorized the use of chemical agents to coerce Woolverton's compliance with the jail's strip search and hand restraint procedure, a reasonable officer could have concluded, based on the information available to Major Gruver (including the Video), that the authorized use of force in this case was not excessive. Although in the Video Woolverton appears to have difficulty breathing after the use of OC spray, as explained above, an unidentified nurse states that Woolverton is *not* asthmatic; Killian states that Woolverton's blood oxygen level is normal; and Woolverton quickly recovers from the claimed effects of the OC spray, exhibiting aggressive behavior that is inconsistent with a person who is suffering from an asthma attack. A reasonable officer could have concluded, based on the Video in its entirety, that Woolverton did not have asthma. In addition, on October 22, 2013, Major Gruver acted consistently with the Plan, which expressly permits the use of chemical agents when "an offender fails to comply with a lawful order" and other lesser methods of gaining compliance have proved ineffective. Ps. 11/1/17 App. (ECF # 240) at 196. As noted above, to prevent against unnecessary harm to inmates, the Plan requires that, "[p]rior to the use of chemical agents, where circumstances permit, medical and mental health staff shall be consulted, and medical records shall be reviewed to determine if the use of chemical agents would be detrimental to the mental or physical health of the offender involved." *Id.* at 197. Plaintiffs have presented no evidence that Killian, a licensed vocational nurse who was present prior to and during the entire use of force on October 22, 2013, ever informed Major Gruver that Woolverton had asthma or that the use of force in this instance would be detrimental to Woolverton's mental or physical

health.  Based on Killian's failure to object to the planned use of force on October 22, 2013, a reasonable officer could have concluded that using OC spray on Woolverton would not constitute excessive force.  In sum, despite Woolverton's statement in the Video that he had asthma, and his apparent labored breathing after the use of OC spray, the court cannot hold that *all* reasonable officers would have concluded, based on the information available, that the use of chemical agents on Woolverton on October 22, 2013 constituted excessive force.  Accordingly, for this alternative reason, the court holds that Major Gruver is entitled to summary judgment, based on qualified immunity, dismissing plaintiffs' Eighth Amendment excessive force claim.

IV

The court holds that Killian is entitled to summary judgment based on qualified immunity with respect to plaintiffs' Eighth Amendment-based § 1983 claim for deliberate indifference to Woolverton's serious medical needs.

A

"A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when [her] conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate

indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Instead, to demonstrate an Eighth Amendment violation, a prison inmate must show that "a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Easter*, 467 F.3d at 464 (quotation marks and citation omitted).

In *Farmer v. Brennan* the Supreme Court held that, in order to establish an Eighth Amendment claim under a theory of deliberate indifference, a plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The *Farmer* Court explained that this "subjective recklessness" standard does not require a plaintiff to "show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 839, 842; *see also Domino*, 239 F.3d at 755.

Circumstantial evidence may sufficiently establish the subjective recklessness standard because the court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 842). Accordingly, the Fifth Circuit has upheld findings of deliberate indifference when a plaintiff alleges facts of an apparent or obvious risk to a prisoner's

health, supporting an inference that the official had "actual awareness" of a serious medical need. *See, e.g., United States v. Gonzales*, 436 F.3d 560, 573-74 (5th Cir. 2006) (upholding a finding of deliberate indifference when evidence established that officers failed to seek medical assistance for a detainee who was lying on the ground with a broken neck, "foaming at the mouth," begging for help, and yelling "take me to a hospital"), *overruled on other grounds as stated in United States v. Garcia-Martines*, 624 Fed. Appx. 874, 879 n.12 (5th Cir. 2015); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (inferring deliberate indifference when minor was unconscious and vomiting for two hours before officials sought medical help); *Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999) (finding deliberate indifference when prison officials ignored repeated requests for immediate, emergency care and ignored multiple reports of "excruciating pain" caused by the dislocation of a prisoner's jaw).

B

The court concludes that plaintiffs have not introduced sufficient evidence for a reasonable jury to find that, in failing to clean the residue of OC spray from Woolverton's face and body, leaving Woolverton without access to his asthma inhaler, and leaving Woolverton on his cell floor for longer than 10 hours without supervision or medical follow-up,[7] Killian "acted or failed to act despite [her] knowledge of a *substantial* risk of *serious*

---

[7]The amended complaint alleges that Killian exhibited deliberate indifference by failing to clean the residue of OC spray from Woolverton's face and body and leaving him in a cell covered in the residue when he was incapable of cleaning himself; leaving Woolverton without access to his prescription asthma inhaler after he said he was unable to

- 15 -

harm." *Farmer*, 511 U.S. at 842 (emphasis added). Viewing the evidence in the light most favorable to plaintiffs, Killian was aware of the fact that Woolverton had asthma and that there was a "Do Not Gas" indication in his medical file, and she testified that she "had an understanding of the risks and dangers to patients who are asthmatic." Ps. 11/1/17 App. (ECF # 237) at 178-79. Killian was also aware that Woolverton was ill, testifying repeatedly that his illness was the basis for her insistence that he go to the medical clinic. Woolverton stated during his clinic visit, "my face is killing me," and "I can't breathe," P. 11/1/17 Br. (ECF # 236) at 41, and when he was returned to his cell, although Woolverton stated that he could not breathe and that his genitals hurt, Killian indicated in her Use of Force Nursing Note that "[p]atient denies any injuries and denies respiratory difficulty," Ps. 11/1/17 App. (ECF # 237) at 64. Nevertheless, Woolverton has not presented evidence that Killian knew, after the administration of the OC spray, that Woolverton was actually experiencing

_____

breathe; and leaving Woolverton on the floor of a cell naked for a duration longer than 10 hours without supervision or medical follow-up, with no clothing, blankets, towels, or mattress, on a cold night. Although the amended complaint alleges additional actions (or inaction) in support of plaintiffs' deliberate indifference claim, the court only lists here the allegations that apply to Killian. Notably, although plaintiffs argue in their response to defendants' motion for summary judgment that Killian "intentionally treated Mr. Woolverton incorrectly when she authorized the use of pepper spray against him despite her awareness of his infirmity," P. 11/1/17 Br. (ECF # 236) at 38, plaintiffs have not pleaded an Eighth Amendment deliberate indifference claim based on the use of OC spray on October 22, 2013. The only allegations related to the use of OC spray that plaintiffs list in their deliberate indifference claim are: "failing to adequately evaluate Mr. Woolverton *after the use of OC spray* on October 22, 2013," Am. Compl. ¶ 65(h) (emphasis added); failing to clean the residue of OC spray from Woolverton's face and body and leaving him in a cell covered in the residue when he was incapable of cleaning himself; and leaving Woolverton without access to his prescription asthma inhaler after he said he was unable to breathe.

difficulty breathing as a result of his asthma, as opposed to merely experiencing the effects of the OC spray. Dr. Bittle examined Woolverton and did not indicate that Woolverton was experiencing symptoms of an asthma attack. In fact, Dr. Bittle's notes from his October 22, 2013 examination state that Woolverton "has good breath sounds and cardiac sounds and his voice is loud and clear." *Id.* at 73. Moreover, Dr. Bittle cleared Woolverton for return to his cell, which would have reasonably suggested to Killian that Dr. Bittle had concluded that Woolverton was *not* experiencing an asthma attack as a result of the OC spray. Finally, although Killian likely knew that the OC residue was causing the discomfort that Woolverton reported when he was placed in his new jail cell, there is no evidence that would enable a reasonable jury to find that she knew that there was a substantial risk of *serious* medical harm, especially given the amount of time that had elapsed since the administration of the OC spray and the lack of any visible symptoms of breathing difficulty. In sum, plaintiffs have failed to present any evidence that Killian knew that, by not cleaning the OC residue from Woolverton's face and body, she was failing to act despite her knowledge of a substantial risk of serious medical harm.

Regarding Killian's failure to ensure that Woolverton was given his asthma inhaler after he was placed in the new cell, as explained above, plaintiffs have not adduced any evidence that would enable a reasonable jury to find that Killian knew that Woolverton *required* his inhaler and that, without it, there was at a substantial risk of serious medical harm—i.e., that Woolverton would have an asthma attack. Moreover, Killian testified that it was the officers in the jail, not medical staff, who were in charge of moving inmates'

property to their new cells, and there is no indication that Killian knew that prison officials would *not* bring Woolverton's asthma inhaler to his new cell.

Finally, plaintiffs have not presented evidence that would enable a reasonable jury to find that Killian knew that Woolverton had a massive kidney infection that required further treatment and close monitoring by medical staff, and that she failed to act despite this known risk. Killian testified that she knew Woolverton was ill, and she admitted that she knew that patients could die from kidney failure. She also testified that, after Woolverton was returned to his cell, she told Dr. Bittle that she thought Woolverton was sick and that Dr. Bittle should go look at him again. But even if Killian knew that Woolverton was sick, there is no evidence that she knew what was wrong with him (i.e., that he had "overwhelming infection and sepsis against the background of debility from his chronic kidney disease," Ps. 11/1/17 Br. (ECF # 236) at 25), or that Woolverton faced a substantial risk of imminent death absent immediate medical intervention. In other words, plaintiffs have failed to present evidence that would enable a reasonable jury to find that Killian *knew* that Woolverton required medical monitoring and that he should not have been left unattended after he was returned to his cell.

In sum, the court concludes that plaintiffs have not presented sufficient evidence for a reasonable jury to find that Killian's actions or inaction following the administration of the OC spray violated Woolverton's Eighth Amendment rights. Killian's knowledge that Woolverton was sick on October 22, 2013, that he suffered from asthma, and that he stated that he could not breathe (even though there is no indication in the record that Woolverton

was exhibiting any visible symptoms of an asthma attack after the use of force) do not rise to the level of an "obvious" or apparent risk to Woolverton's health sufficient to infer that Killian acted with deliberate indifference. *See Gonzales*, 436 F.3d at 573-74. Even assuming that the facts suggest that Killian acted negligently, that alone is insufficient to establish a cognizable claim under the Eighth Amendment. *See Gobert*, 463 F.3d at 346 ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."). Plaintiffs have therefore failed to present a genuine issue of material fact that Killian—who insisted that Woolverton be taken to the medical clinic on October 22, 2013—acted with deliberate indifference. *Cf. Easter*, 467 F.3d 459 (finding that nurse was deliberately indifferent by failing to provide medical care when she was actually aware of detainee's heart condition, and detainee presented obvious signs of serious cardiac health risks). Accordingly, the court grants Killian's motion for summary judgment on plaintiffs' § 1983 Eighth Amendment deliberate indifference claim.

V

Although the court has adopted the magistrate judge's recommendation that the court grant summary judgment dismissing plaintiffs' § 1983 Eighth Amendment deliberate indifference claim against Dr. Bittle, it deems it necessary to address some of the arguments raised in plaintiffs' objections to the magistrate judge's findings, conclusions, and recommendation.

A

Plaintiffs contend that the magistrate judge's findings of fact regarding Dr. Bittle ignore evidence in the record and include a significant factual error. Plaintiffs summarize the objections as follows:

> [t]he findings do not cite to Defendant Bittle's deposition testimony, referenced by Plaintiff, that demonstrates that Defendant Bittle was aware that Mr. Woolverton was in acute medical crisis on October 22. Additionally, they do not include the evidence that Defendant Bittle did not provide care or diagnosis to address Mr. Woolverton's acute medical condition. They also mistakenly conclude that a guaiac test is a test for infection, when the uncontroverted evidence demonstrates that a guaiac test is not used to diagnose infection. They further fail to recognize that there is a question of fact as to whether Defendant Bittle ordered or performed a guaiac test on October 22. Finally, the findings ignore conflicting testimony regarding whether Defendants visited Mr. Woolverton's cell following his visit to the medical clinic.

Ps. 7/4/18 Objs. at 2.[8]

B

Plaintiffs have produced evidence that Woolverton was seen by Dr. Bittle on July 30, 2013; that, on August 5, 2013, Dr. Bittle ordered that Woolverton be given a container of

---

[8]Plaintiffs also object to the magistrate judge's conclusions and recommendations on the ground that the magistrate judge "ignore[d] the case law establishing that blatantly inappropriate medical care may constitute deliberate indifference." Ps. 7/4/18 Objs. at 12. Assuming *arguendo* that plaintiffs have correctly recited the standard for deliberate indifference, the court concludes, based on the evidence set out below, *see infra* § V(B), that a reasonable jury could not find that Dr. Bittle "was aware that Mr. Woolverton was in medical crisis and did not provide care or diagnostic testing for that crisis despite his knowledge of the proper diagnostic steps to take." *Id.*

Betadine; that, on September 2, 2013, Dr. Bittle ordered a red rubber catheter # 12 and package of lubricant be taken to Woolverton (medical records indicate that there was no coude catheter available); that, on September 3, 2013, Dr. Bittle noted that Woolverton was having difficulty using his catheter and ordered an exchange of his catheter, a betadine swab packet, and a lubricant package; that a treatment plan signed by Dr. Bittle on September 4, 2013 indicated that Woolverton had renal insufficiency, neurogenic bladder, and regular infections; that Dr. Bittle signed nursing notes on September 11, 2013 indicating that Woolverton had requested a size 16 french catheter, that he had refused the size 14 catheter that Dr. Bittle had ordered, and that he had been re-educated on the proper use of a catheter; that, on October 17, 2013, Dr. Bittle signed nursing notes indicating that Woolverton refused to exchange his old catheter for new supplies; and that, on October 19, 2013, Dr. Bittle signed nursing notes indicating that Woolverton refused to exchange his catheter and "[h]as not exchanged his catheter in 2 noc and refuses to get out of bed," Ps. 11/1/17 App. (ECF # 237) at 60. Video evidence shows that when Woolverton was brought to the medical clinic on October 22, 2013, Dr. Bittle performed an examination, and notes from Dr. Bittle's October 23, 2013 examination state:

> 48 y/o WM who has history of neurogenic bladder who is complaining of kidney pain and who was found in his cell clothed on the ground. He refused to get up and nursing was called. He was then found to be half naked on the ground. He then had a UOF and was gassed. He was then taken to ECB-ER/clinic room and was examined. His kidneys are not tender his skin is red and moist. He has good perfusion of the extremities. He has good breath sounds and cardiac sounds and his voice is loud and clear. Mr. Woolverton has a history of

being very manipulative in his behavior with staff.

*Id.* at 73.  Dr. Bittle's clinic notes also indicate that Woolverton "has black stool that is [guaiac] negative when tested."[9]  *Id.*

A reasonable jury could not find from the summary judgment evidence that Dr. Bittle refused to treat Woolverton, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017) (quoting *Easter*, 467 F.3d at 464).  There is undisputed evidence in the record that Dr. Bittle *did* treat Woolverton in the days leading up to October 22, 2013.  And even if Dr. Bittle's examination of Woolverton is deemed cursory, Dr. Bittle could have reasonably concluded that the symptoms of distress that Woolverton was exhibiting during the October 22, 2013 examination were the expected results of the OC spray, that Woolverton was yet again attempting to manipulate prison staff, and that no immediate treatment for Woolverton's underlying medical conditions was necessary at that time.

\* \* \*

For the reasons explained, the court adopts in part the magistrate judge's findings, conclusions, and recommendations, and in part grants summary judgment based on *de novo* review of defendants' motions.  The court adopts the magistrate judge's recommendation that

---

[9]Plaintiffs maintain that a fact question exists concerning whether Dr. Bittle ordered or performed a guaiac test, and that, "[e]ven if he did, a guaiac test is not a test for infection." Ps. 7/4/18 Objs. at 18.  Even if the court disregards Dr. Bittle's notation regarding the guaiac test, its conclusion that Dr. Bittle did not act with deliberate indifference remains the same.

summary judgment be granted on plaintiffs' § 1983 excessive force and deliberate indifference claims against defendants Warden David, Sgt. Gratz, Lt. Seymour, and Shook based on qualified immunity.[10] The court adopts the magistrate judge's recommendation that summary judgment be granted in favor of defendants Major Gruver and Dr. Bittle on plaintiffs' § 1983 deliberate indifference claim. The court grants summary judgment in favor of defendant Major Gruver on plaintiffs' § 1983 excessive force claim. The court grants summary judgment in favor of defendant Killian on plaintiffs' § 1983 deliberate indifference claim. The court denies Killian's motion for summary judgment—which is limited to the ground that there are no allegations or evidence that Killian used force against Woolverton or authorized the use of excessive force against him—as to plaintiffs' Eighth Amendment-based § 1983 excessive force claim.

Plaintiffs' claims against defendants Warden David, Sgt. Gratz, Lt. Seymour, Major Gruver, Dr. Bittle, and Shook are dismissed with prejudice by Fed. R. Civ. P. 54(b) final judgment entered today. Plaintiffs' deliberate indifference claim against defendant Killian

---

[10]As noted, Shook's motion is unopposed.

is dismissed.[11]

**SO ORDERED**.

September 18, 2018.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[11]Brad Livingston, Executive Director of TDCJ ("Director Livingston"), is designated as a defendant in plaintiffs' complaint, but he is omitted as a defendant in plaintiffs' amended complaint. Accordingly, in the judgment filed today, the court is dismissing plaintiffs' action against Director Livingston without prejudice and is ordering that plaintiffs and Director Livingston bear their respective taxable costs of court.